IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

THERMAL SOLUTIONS, INC.,        )
                                   )
          Plaintiff,         )
                                   )
       v.                  )      Case No. 08-2220-JWL
                                   )
IMURA INTERNATIONAL U.S.A., INC.,  )
VITA CRAFT CORPORATION, and     )
MAMORU IMURA, an individual,      )
                                   )
         Defendants.      )
                                   )
_____)

## MEMORANDUM AND ORDER

Plaintiff Thermal Solutions, Inc. ("TSI") has brought patent infringement claims against Imura International USA, Inc. ("II-USA") and its subsidiary, Vita Craft Corporation ("Vita Craft"), as well as against Mamoru Imura, who is alleged to control both corporate defendants. The parties have submitted their arguments concerning the construction of various terms found in the relevant patents' claims, both in written submissions and at the hearing held on September 21, 2009. The Court construes those terms as set forth herein.

## I.    Background

Plaintiff TSI holds United States Patent Nos. 6,232,585 ("the '585 Patent") and 6,320,169 ("the '169 Patent), which were originally sought by TSI's president, Brian

Clothier, the purported inventor for those patents.  The patents relate generally to systems for heating objects by electromagnetic induction that may also include the use of Radio Frequency Identification (RFID) technology.  In its amended complaint, TSI alleges that it entered into license agreements by which defendants could use the patented systems in conjunction with their sale of household cookware; that defendants breached those agreements; and that defendants then infringed the '585 and '169 Patents by continuing to use the patented systems in their products after TSI terminated the license agreements.  TSI thus asserts patent infringement claims against defendants pursuant to 35 U.S.C. § 271.  TSI also seeks a declaration that United States Patent No. 7,157,675 ("the '675 Patent"), issued to Mr. Imura and assigned to II-USA, is invalid. Finally, TSI asserts state-law claims against defendants for breach of contract, misappropriation of trade secrets, and unfair competition.

Defendants have asserted a number of counterclaims against TSI.  Defendants seek declarations of invalidity, non-infringement, and unenforceability with respect to the '585 and '169 Patents, as well as with respect to United States Patent No. 6,953,919 ("the '919 Patent"), another Clothier patent held by TSI.  Defendants also assert state-law claims against TSI for breach of contract, tortious interference with contract, and tortious interference with business advantage.

2

## II.    Claim Construction Standards

Claim construction is governed by the methodology set forth by the Federal Circuit Court of Appeals in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  It is a bedrock principle of patent law that the claims of the patent define the patentee's invention.  *Id.* at 1312.  Thus, claim construction begins with the words of the claim itself.  *Id.*  The words of a claim should be given their ordinary and customary meaning as understood by a person of ordinary skill in the art in question at the time of the invention.  *Id.* at 1312-13.  "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."  *Id.* at 1314.  Both "the context in which a term is used in the asserted claim" and the "[o]ther claims of the patent in question" are useful for understanding the ordinary meaning.  *Id.*

The claims do not stand alone, but are part of "a fully integrated written instrument."  *Id.* at 1315.  Therefore, they "must be read in view of the specification, of which they are a part."  *Id.* (quotation omitted).  In fact, the specification is "the single best guide to the meaning of a disputed term" and is often dispositive.  *Id.*  The specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, in which case the inventor's lexicography governs.  *Id.* at 1316.  In other cases, it may reveal an intentional disclaimer or disavowal of claim scope by the inventor; in that case, "the inventor has dictated the correct claim scope, and the inventor's invention, as expressed in the specification, is regarded as dispositive."  *Id.*  The fact that the specification includes limited and specific

3

embodiments is insufficient to define a term implicitly, and it is improper to confine the scope of the claims to the embodiments of the specification. *Id.* at 1323. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quotation omitted).

Moreover, the court must be careful not to import limitations from the specification into the claim. *Id.* at 1323. In walking the "fine line" between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim, the court must "focus . . . on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.* The purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so. *Id.* Reading the specification in context should reveal whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive. *Id.* Thus, the court's task is to determine "whether a person of skill in the art would understand the embodiments to define the outer limits of the claim term or merely to be exemplary in nature." *Id.*

The court should also consult the patent's prosecution history, if in evidence. *Id.* at 1317. Like the specification, the prosecution history "provides evidence of how the PTO [Patent and Trademark Office] and the inventor understood the patent." *Id.* "Yet

4

because the prosecution represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Finally, the court may consult extrinsic evidence such as expert and inventor testimony, dictionaries, and learned treatises. *Id.* These have all been recognized as tools that can assist the court in determining the meaning of particular terminology. *Id.* at 1318. Extrinsic evidence may be helpful to the court in understanding the technology or educating itself about the invention. *Id.* In particular, because technical dictionaries collect accepted meanings for terms in various scientific and technical fields, they can be useful in claim construction by providing the court with a better understanding of the underlying technology and the way in which one skilled in the art might use the claim terms. *Id.* at 1318. "However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Id.* Extrinsic evidence is less reliable than intrinsic evidence in determining the construction of claim terms, and therefore the court should discount any expert evidence that is at odds with the intrinsic evidence. *Id.*

With respect to almost all of the patent terms at issue here, defendants do not rely on any particular language from the patent claims to support their construction, but instead argue that the relevant specification "repeatedly and consistently" describes (and limits) the claimed invention in a particular way consistent with their urged construction. Defendants rely particularly on the Federal Circuit's opinion in *Microsoft Corp. v. Multi-*

5

*Tech Sys., Inc.*, 357 F.3d 1340 (Fed. Cir. 2004), in which the court relied for its construction on the fact that the specification "repeatedly and consistently" described the overall invention—and not merely a preferred embodiment—in a particular way. *See id.* at 1347-48; *see also Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1398 (Fed. Cir. 2008) ("repeated" use of the phrase "the present invention" described the invention as a whole; specification "consistently" described the invention in a particular way); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008) (reading claim in light of specification's consistent emphasis on a fundamental feature of the invention); *Honeywell Int'l v. ITT Indus.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (description did not refer merely to a preferred embodiment, but shows that the scope of the relevant claim is limited); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term.").

This Court had occasion recently to apply the *Microsoft* "repeated and consistent description" standard. *See Sprint Communications Co. v. Big River Tel. Co.*, 2009 WL 1992537 (D. Kan. July 8, 2009). In *Sprint*, the Court rejected the argument that "a court may not rely on a specification's description to limit the scope of a claim or the meaning of a term unless the specification includes an express disclaimer or disavowal of scope." *See id.* at *3. The Court summarized the relevant caselaw from the Federal Circuit concerning the *Microsoft* standard as follows:

6

It is clear from these cases from the Federal Circuit that the repeated and consistent use of a term in a particular manner in the specification may support a narrow construction of a claim term, even without an express disclaimer of scope by the inventor in the patent.  In such an instance, the consistent description of the entire claimed invention discloses the inventor's intent regarding the meaning of the term and the scope of the invention.  At the same time, however, the repeated and consistent use of the term must refer to the invention as a whole, and not merely to one or more embodiments of the claimed invention, as claim scope may not be limited merely to conform to the scope of the embodiments.

*Id.*

### III.    <u>Construction of Claim Terms</u>

The parties dispute the proper construction of seven terms from the '585 and '169 Patents.[1]  Six of those claim terms may be found in Claim 1 of the '585 Patent, which claims the following:

---

[1]According to a list of the parties' competing constructions provided by defendants, the term "RFID tag" may also be found in the '919 and '675 Patents.  Neither party has alleged infringement of either of those patents, however; nor have the parties offered any arguments concerning the construction of "RFID tag" as found in those patents.  Therefore, the Court declines to construe the term "RFID tag" as found in the '919 Patent and the '675 Patent.

1.    An apparatus comprising:

a magnetic induction heater including a magnetic field generator for
    generating a magnetic field, said heater having an RFID reader
    associated therewith;

an object to be magnetically heated including an induction heatable
    element and an RFID tag, and

said heater having a microprocessor operably connected with said RFID
    reader for initiating the heating of said object only upon placement
    of said object proximal to said heater and in a position for RF
    communication between said tag and said reader, and for
    controlling the operation of said heater in response to information
    received from said tag.

(Emphasis added to denote disputed claim terms.)  The Court addresses each of the

disputed terms in turn.[2]


    A.    *"An Object to Be Magnetically Heated Including an Induction*
          *Heatable Element and an RFID Tag"*

    The parties dispute the proper construction of the term "an object to be

magnetically heated including an induction heatable element and an RFID tag," which

object is included in the apparatus claimed in the '585 Patent.  TSI argues that the term

means *an object that includes an induction heatable element and an RFID tag*;

defendants argue that the term should be construed to mean *a food delivery container*

_____

    [2]Each term (or a very similar term) appears in multiple claims within the same
patent or patents.  The parties have not offered different constructions depending on the
particular claims in which a term is found.  Thus, the Court assigns the same construction
to each term (or substantially similar term) wherever it appears in the claims at issue in
the suit.

*made of a non-inductively heatable material that includes an element and an RFID tag;*

*but not a temperature sensor.*  Thus, TSI essentially repeats the claim language, while

defendants define "object" in the claims to include three limitations not found in the

claim language:  (1) the object is a food delivery container (2) that is made of non-

inductively heatable material and (3) that cannot include a temperature sensor.

Defendants do not rely on any express definition of "object" or disclaimer or disavowal

of claim scope in the patent; rather, defendants rely on the *Microsoft* standard, discussed

above, which allows the claim scope to be limited if the patent "repeatedly and

consistently" describes the scope of the invention (and not a mere embodiment) as

limited.[3]

    With respect to the first limitation urged by defendants, the Court concludes that

the '585 Patent's specification does repeatedly and consistently describe the invention

as a whole as a "food delivery system" involving a "food container".  The title of the

patent is "Temperature Self-Regulating Food Delivery System."  The first sentence of

the patent's Abstract states that "[t]emperature self-regulating food delivery systems are

---

[3]The Court does not agree with defendants' argument that reference to the '585 Patent's specification is required here to provide context because "object" is a common, non-technical word that necessarily requires limitation.  The word is not ambiguous, and the claims themselves provide sufficient context and limitations to ensure that not every conceivable "object" in the world is claimed in the patent.  Because there is no clear disclaimer or disavowal of claim scope here, TSI is entitled to the entirety of its patent claims, subject to limitations imposed by consistent and repeated descriptions of the invention under *Microsoft*.  Any argument that the patent's claims are impermissibly broad must await later proceedings, as only the construction of the patents is presently before the Court.

provided."  The Background of the specification begins as follows:

> The present invention is broadly concerned with food delivery systems designed to maintain food at a selected temperature over relatively long periods of time.  More particularly, the invention pertains to such food delivery systems which include a magnetically heatable thermal storage device within a food-holding container . . . .

('585 Patent at 1:11-18.)  The Background section concludes as follows:

> There is accordingly a need in the art for an improved food storage and delivery system which will permit the purveyor to maintain the food products at or near a desired temperature over sustained periods, while also allowing delivery under conditions to substantially maintain this temperature.  An effective hot food storage and delivery system thus requires a lightweight delivery container . . . .

(*Id.* at 2:5-11.)  Similarly, the Summary of the Invention in the specification begins with the following statement:

> The present invention overcomes the problems outlined above [in the Background] and provides a food delivery system broadly including a food delivery container equipped with a thermal storage device with the latter being heated while in the container by a magnetic induction charging station.

(*Id.* at 2:18-22.)  The specification's Detailed Description of the Preferred Embodiments begins as follows:

> The present invention provides a food delivery system broadly comprising a food delivery container . . . .  As explained above, one type of food item requiring temperature maintenance during delivery is pizza, and accordingly certain embodiments of the invention are specific to this problem.  However, it should be understood that the invention is not limited to pizza temperature maintenance, but rather relates to any type of food delivery system for virtually all food items which require or may be rendered more palatably by temperature maintenance.

(*Id.* at 5:25-38.)

Thus, contrary to TSI's argument, the patent's specification does not describe an invented heating system that can, among other things, be used to solve food delivery problems. Rather, the patent repeatedly and consistently describes the invention as a whole, and not a mere embodiment of the invention, as a food delivery system involving a food delivery container. Even the specification's language that attempts to ensure a construction broader than the mere embodiments, quoted above, describes the invention as a food delivery system (as opposed to the pizza delivery system described as the preferred embodiment). Accordingly, the Court agrees with defendants that the object described in the claims should be limited to a food delivery container.

TSI argues that application of the *Microsoft* standard is not appropriate here, despite the quoted descriptions of the invention as a food delivery system, because the claim refers to an "object" and not the more specific "container", and thus the required "consonance" between the claim and the specification is missing here. The Court rejects this argument, as there is no authority for limiting the *Microsoft* standard in this way. As explained above, claims are properly limited to the repeated and consistent description of the actual invention. TSI's citation to this Court's decision in *MGP Ingredients, Inc. v. Mars, Incorporated*, 494 F. Supp. 2d 1231 (D. Kan. 2007), is inapt, as that case did not involve application of the *Microsoft* "repeated and consistent description" standard. *See id.* at 1236-39.

TSI also argues, based on the doctrine of claim differentiation, that "object" in the independent claims of the patent must be broader than food delivery containers in light

11

of dependent claims 2 and 5 in the patent, which claim the apparatus and method of independent claims 1 and 4 "with said object comprising a food holding container."  The Federal Circuit has stressed, however, that the presumption that dependent claims must be narrower than their independent claims is rebuttable, and the presence of such dependent claims is therefore not dispositive:

> [W]hile it is true that dependent claims can aid in interpreting the scope of claims from which they depend, they are only an aid to interpretation and are not conclusive.  Indeed the presumption created by the doctrine of claim differentiation is not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history.

*Regents of Univ. of Calif. v. Dakocytomation Calif., Inc.*, 517 F.3d 1364, 1375 (Fed. Cir. 2008) (internal quotations and citations omitted).  In this case, the specification's clear description of the claimed invention (and not merely an embodiment) as a food delivery system involving a food container dictates the construction urged by defendants and overcomes any presumption raised by the dependent claims.  *See Sprint v. Big River*, 2009 WL 1992537, at *12-13 (concluding that consistent and repeated description of invention as limited rebutted presumption raised by dependent claims).

Defendants have not pointed to any portions of the patent's specifications in which the invention is consistently and repeatedly described with the second and third limitations urged by defendants in their construction of "object" (relating to non-inductively heatable material and the absence of a temperature sensor).  Thus, there is no basis to construe the term "object" to include those limitations.

Accordingly, the Court construes the term "an object to be magnetically heated including an induction heatable element and an RFID tag," found in the claims of the '585 Patent, to mean *a food delivery container to be magnetically heated that includes an induction heatable element and an RFID tag*.

### B. *"An Induction Heatable Element"*

The parties next dispute the proper construction of the term "an induction heatable element" from the claims of the '585 Patent. TSI seeks to construe the term to mean *a structure or portion of a structure that is made of a material capable of being magnetically heated*. Defendants argue for the following construction: *an inductively heatable metallic alloy: (i) having a Curie point temperature below the pre-selected regulation temperature causing the alloy's load impedance to change significantly over the temperature range it experiences; and (ii) being a distinct structure enclosed within the food delivery container such that the alloy does not contact the food in said container*.

Based on its proposed construction, TSI defines "induction heatable" as being "capable of being magnetically heated." At the hearing before the Court, defendants stated that they agreed with that definition of "induction heatable." Therefore, the Court will include that definition in its construction of "an induction heatable element."

TSI appears to define "element" as " a structure or portion of a structure," while defendants substitute "structure" for "element" in their construction. Neither side has

supported that part of their construction with any citation to intrinsic or extrinsic evidence of the meaning of "element" here.  Nor have the parties explained why the word "element" needs further definition or would not be understood by a person schooled in the relevant art.  Accordingly, the Court declines to define the word "element" as used in the claim terms.

Defendants also seek to add the following four limitations in their construction of "element":  (1) the element is a metallic alloy, (2) with a Curie point temperature below a pre-selected regulation temperature, (3) that is a distinct structure (4) enclosed within food delivery container so as not to contact the food.  Again, defendants cannot identify any disclaimer or disavowal of claim scope to support these limitations, and thus they rely solely on application of the *Microsoft* standard.

The parties' primary dispute is whether the element must be separate and distinct from the "object" or whether the element can be a non-separable part of the object to be heated.  (TSI apparently claims that a layer within defendants' cookware infringes the patent on this basis.)  Defendants argue that the specification shows that the invention's "element" is distinct and separable from the container (the "object").  Defendants cite to various portions of the specification in which the thermal device is described as being "within" or "in" the container or the container is described as being "equipped with" the thermal device.  *See* '585 Patent at 1:11-16, 2:4-26, 2:18-22, 2:65-67, 5:24-26.  Those descriptions, using "within" or "equipped with", do not necessarily require a separate element or exclude a container containing the thermal device "within" it as a part of the

14

container, however.  Nor does the reference to a "lightweight" container, *see id.* at 2:10-11, clearly require a separate, non-included element.  The specification's figures that show containers with recesses or velcro for holding the element in place, cited by defendants, represent mere embodiments and do not describe the invention as a whole as requiring a separate and distinct element.  *See id.* at 7:11-21, 12:2-6, 12:59-61.  Thus, the specification does not repeatedly and consistently describe the invention as having this limitation urged by defendants.[4]

Finally, defendants point to TSI's proposed construction for this term in a prior case involving another party, *Vesture Corporation v. Thermal Solutions, Inc., et al.*, No. 1:01CV01006 (M.D.N.C.), in which TSI defined "element" as "a distinct structure or part of a structure."  Even assuming that this prior litigation position may be considered (defendants have provided no such authority), the Court does not find the prior construction to be helpful, as it could reasonably be read to include a non-distinct "part" of a structure.

---

[4]Defendants also cite to the provisional application for the '585 Patent, which states that the energy source is not in contact with the pizza box or pizza, but those descriptions refer to mere embodiments and not necessarily the invention as a whole. The Court also rejects defendants' argument based on inventor Clothier's description of the '585 Patent in another patent, for a number of reasons:  in citing the '585 Patent, Mr. Clothier stated that one method was to insert or *incorporate* the heat-retentive body into the container, and thus he did not limit his '585 Patent invention to a system with an element separate from the container; Mr. Clothier was not really defining the scope of the '585 Patent's claim in the other patent; and defendants have not shown that the other patent is related to the '585 Patent. *See Ormco Corp. v. Align Technology, Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007) (statements in familial patent applications may be relevant), *cert. denied*, 128 S. Ct. 2430 (2008).

15

Accordingly, the Court concludes that defendants have not shown that this term should be construed with the limitation of an element distinct and separate from the food container under the *Microsoft* standard.  Nor have defendants adequately supported their other urged limitations with citations to intrinsic or extrinsic evidence.  The fact, noted by defendants, that the specification never discusses any contact between the element and the food certainly does not constitute a clear disclaimer of scope or a consistent and repeated description of the invention with that limitation.  Defendants do not offer any argument or citation to the record to support the other two limitations urged in their construction.  Therefore, the Court rejects all of the limitations included in defendants' proposed construction.

The Court construes the term "an induction heatable element" from the '585 Patent to mean *an element made of a material capable of being magnetically heated*.


C.      "Information"

The claims of the '585 Patent and the '169 Patent refer to the use in their respective processes of "information" sent by an RFID tag to an RFID reader.  Defendants do not contend that the term "information" is ambiguous or has a special meaning as used in the patents; rather, defendants rely on *Microsoft* to add limitations to the claim, as they argue that "information" should be construed to mean *system or process data none of which is actual or real-time temperature measurements*.  TSI does not believe that any further construction of the term "information" is necessary.

16

Defendants do not offer any argument or citation to support the requirement that the information be "system or process data." Therefore, the Court rejects that portion of defendants' proposed construction. Defendants instead focus on its proposed limitation that the information cannot include actual temperature measurements.

With respect to the '585 Patent, defendants note that the specification describes the RFID technology as an alternative to photo sensors in determining whether the food container is in place on the heater, *see* '585 Patent at 6:43-7:32, and describes the information from the RFID tag as relating to the size of the container or the number or duration of trips, *see id.* at 24:33-53. Thus, defendants argue that the information does not include actual temperature information. Defendants also argue that the '585 specification "teaches away" from the use of actual temperature information to control the heating of the container, and that instead feedback from the RFID tag regarding impedance is used. *See id.* at 3:4-12, 3:30-45, 14:40-51, 19:12-44. All of these statements, however, relate to embodiments or merely list examples of information that may be sent from the RFID tag. The '585 specification never states that the information from the RFID tag cannot include temperature information; thus, the specification cannot be said to describe the invention as one using information from an RFID tag that cannot include temperature information.

Similarly, with respect to the '169 Patent, defendants cite to a portion of the specification that lists the information from the RFID tag as the identification of the object and the last step performed in the heating algorithm, *see* '169 Patent at 7:49-53,

and they note that temperature information is not included in that list.  Defendants also argue that the '169 Patent "teaches away" from using actual temperature to control the heating process, as the specification goes into great detail about how the temperature is estimated by algorithms.

Again, the Court concludes that these citations are not sufficient to support the limitation urged by defendants.  The estimation discussion and the list of the types of information in the cited portion of the '169 Patent specification relate to embodiments and not to the invention as a whole.  Moreover, in the cited portion, the specification states that the RFID tag should transmit "at least" those types of information—thus, the specification clearly declines to limit the allowable information to those enumerated types.  *See id.* at 7:49-53; *see also id.* at 3:50 ("typically" the information relates to the object).  Indeed, in discussing prior inventions, the Background section of the specification describes how temperature information from the object may be "important," but it is often not sufficient by itself for proper heating control.  *See id.* at 2:47-3:18.  Such a description certainly does not mean that temperature information cannot be used along with the additional information that benefits the process.  Accordingly, the specifications of the two patents do not provide the requisite description of the invention to support the importation of defendants' no-actual-temperature-information limitation into the claims under *Microsoft*.[5]

---

[5]TSI also points to a reference in the specification for the '169 Patent to thermal

(continued...)

18

Defendants also cite to the statements by Mr. Clothier, the inventor, in his '919 Patent and application in which he refers to his prior '585 and '169 Patents as involving systems that do not use actual temperature information. For instance, the '919 Patent itself includes the following statement: "Unfortunately, Clothier [the '585 Patent and the '169 Patent] suffers from a number [of] limitations, including, for example, that it does not employ real-time temperature information from a sensor attached to the vessel." *See* '919 Patent at 2:62-66. The provisional application for the '919 Patent states: "However, Clothier's system does not employ real-time temperature information from a sensor attached to the vessel, where said sensor information is periodically communicated to the RFID reader/writer." *See* '919 Patent prov. applic. at 4; *see also id.* at 6 (noting that one difference from the device in Figure 1 of the '169 Patent is that the subject invention can read real-time temperature information from the RFID tag), 11 (one further capability of the subject invention over the invention in the '169 Patent is that it may read temperature information).

The Court is not persuaded by these citations to impose the urged limitation in claim scope. Defendants have not shown that the '919 Patent is within the same family

---

[5](...continued)

switches in arguing that the patent does contemplate the use of temperature information. In that reference, however, the specification suggests that thermal switches could be used to break a circuit and thus suspend the heating operation when a predetermined temperature is reached. *See* '169 Patent at 4:32-43. It did not suggest that the actual temperature could be transmitted by the RFID tag for use in the control process. Thus, the reference to thermal switches does not appear to be relevant to whether defendants' limitation that would preclude the use of actual temperature information is justified.

as the patents at issue here.  *See Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d at 1350 (statements in prosecution of subsequent related patent may not effect estoppel but may be relevant to claim construction).  Defendants nevertheless argue (without citation to authority) that statements in a separate patent and its prosecution history might be helpful as extrinsic evidence of the meaning intended by the inventor.  "Information" is not an ambiguous or technical term, however; thus, the extrinsic statements here do not provide any evidence from the inventor as lexicographer.  Moreover, the inventor's statements about his own invention are not necessarily helpful.  *See Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346-47 (Fed. Cir. 2008) (inventor's understanding of his invention does not equate to an understanding of the patent claims; "inventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction").  The statements here do not aid the Court's analysis under *Microsoft*, as they do not affect whether the subject patents repeatedly and consistently describe their inventions as limited.  Finally, defendants have not provided any authority suggesting that an inventor can somehow disclaim or disavow claim scope in subsequent statements, and the statements here do not represent a clear disavowal of claim scope at any rate.  *See Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1357-58 (Fed. Cir. 2006) (inventor's intention to disclaim or disavow claim scope must be clear from the specification).

For these reasons, the Court rejects defendants' proposed construction of the term "information" as used in the claims of the '585 Patent and the '169 Patent.  The Court

concludes that no construction of the term is necessary.

> D.   *"For Initiating the Heating of Said Object Only upon . . ."*

The parties' next dispute concerns the following term from the claims of the '585 Patent: "for initiating the heating of said object only upon placement of said object proximal to said heater and in a position for RF communication between said tag and said reader." Defendants seek to construe the term to mean *the microprocessor will initiate heating of the object when the object is placed (i) proximal to said heater and (ii) in a position where RF communication between said tag and said reader, but not before both (i) and (ii) occur.* TSI argues that no further construction is necessary for this term.

By their construction, defendants would limit the scope of the claims to require that two particular steps (placing the object in proximity to the heater and in a certain position to allow RF communication) and nothing more be completed for the heating to commence. Defendants argue that requiring more than a single step promotes safety and efficiency, while requiring *only* two steps furthers the goal of having an easy auto-start function. TSI responds that the claim language, which provides that heating will be initiated "only" upon placement of the object in proximity and in the proper position, requires both steps but does not preclude a system in which more than those two steps are required for heating to commence.

Defendants cite only a single excerpt from the patent's specification in support of their urged limitation. That excerpt, however, refers to the completion of the two

steps "permitting commencement of the heating cycle." *See* '585 Patent at 7:5-10. Thus, the specification does not preclude having additional required steps as well. Defendants also cite to the provisional application for the patent and to an affidavit from the inventor that refer to the ease of starting the process, but neither document states that no additional requirements could ever be imposed.

Defendants have not identified any disclaimer or disavowal of claim scope to support this limitation, and thus appear to rely solely on the *Microsoft* standard here. The specification does not contain any description of the invention as limited in this way, however. Accordingly, the Court rejects defendants' proposed construction and concludes that this term need not be construed further.

### E.    *"Controlling the Operation of Said Heater"*

The parties also dispute the proper construction of the term "controlling the operation of said heater" in the claims of the '585 Patent. TSI argues that no further construction is necessary. Defendants assert that the Court should construe the term to mean *causing the heater to run a pre-programmed heater operation sequence to regulate the temperature of the element at or near a single, predetermined temperature above the element's Curie temperature*. Defendants do not explain why this term is ambiguous in the context of the claims; nor do they point to any disclaimer or disavowal of claim scope. Thus, defendants rely solely on *Microsoft* in their attempt to add limitations to the scope of the claims.

The full claim language reads: "controlling the operation of said heater in response to information received from said tag." Defendants argue that since control is limited to responses from the tag, then the scope of the patent cannot include control by using actual temperature information. Rather, control can only be exercised from information identifying the object to be heated, thereby compelling the selection of a pre-programmed sequence relating to a pre-determined temperature.

The Court rejects defendants' proposed construction. Defendants cite only a single excerpt to the specification in support of this argument, but that excerpt does not contain any description of the invention with the limitation urged by defendants. Moreover, the Court has already rejected defendants' attempt to impose a claims limitation prohibiting the use of temperature information in the control process. *See supra* Part III.C. Defendants have not identified sufficient language in the specification to support importation of these limitations into the claims of the patent. Accordingly, the Court rejects defendants' proposed construction of this term and concludes that no further construction of the term is warranted.

### F.    *"RFID Tag"*

The Court next considers the term "RFID tag", found in the claims of the '585 Patent and the '169 Patent. Defendants propose that the term be construed to mean *a device designed to send a radio frequency signal upon encountering a radio frequency signal or magnetic field*. TSI argues that the term need not be construed. In the

23

alternative, TSI argues that if the term is defined in some way, it should be construed to mean *a device designed to send a radio frequency signal upon encountering a radio frequency signal or magnetic field from an RFID reader and which comprises (1) an antenna designed to receive and transmit radio frequency signals containing information that is not dependent upon the material properties of the antenna alone and (2) an integrated circuit that can store information in an associated electronic memory.*

Thus, as shown by TSI's alternative construction, the parties generally agree that an RFID tag is a device designed to send a radio frequency signal upon encountering a radio frequency signal or magnetic field from an RFID reader. TSI would add the additional limitations that the tag comprise a particular antenna and an integrated circuit or chip. At oral argument, TSI explained that it believed that no construction was necessary for this term, but if the term is defined, the particular type of RFID tag used in the invention should be described.

The Court might ordinarily consider granting a patent-holder's own request to impose a limitation on the scope of its patent's claims. The excerpts cited by TSI for its alternative construction, however, do not support such a limitation, as they refer only to embodiments and not to the invention as a whole. *See* '585 Patent at 3:65-67; '169 Patent at 6:54-58. Moreover, TSI first argues that no construction is necessary, and the Court agrees with that assessment. Defendants have not explained why this term requires construction, and it is clear to the Court that a person schooled in the relevant art would understand the meaning of RFID tag in the context of these claims and its use

24

with an RFID reader.  Accordingly, the Court concludes that no construction of the term "RFID tag" is necessary.

> G.    *"An Induction Heatable Object Including a Component Which Will Be Heated When Subjected to a Magnetic Field"*

Finally, the parties dispute the meaning of the following term from the claims of the '169 Patent:  "an induction heatable object including a component which will be heated when subjected to a magnetic field."  Defendants argue that the term should mean *servingware that is made in part of a non-inductively heatable material, but includes an inductively heatable component and an RFID tag; but not a temperature sensor*.  TSI argues that no construction is necessary.[6]

Defendants rely on the *Microsoft* standard to add three limitations to the scope of the invention:  the object must be (1) servingware (or non-cookware, as defendants suggested at oral argument) that (2) is made in part of a non-inductively heatable material and that (3) does not include a temperature sensor.  With respect to the third limitation, defendants repeat their same argument in support of their limiting construction of "information".  For the same reasons already given, *see supra* Part III.C, the Court rejects that limitation.  Defendants have not offered any arguments or record citations in support of the second limitation, and the Court therefore rejects that proposed limitation as well.

---

[6]At oral argument, TSI abandoned its alternative construction.

With respect to their first proposed limitation, defendants argue that the point of the invention described in the '169 Patent is not to cook food (as it is for defendants' cookware) but rather to maintain an elevated temperature (as it would be for "servingware"). Defendants rely on an excerpt in which the specification states that under ideal operating conditions for a sizzle plate, the plate is always heated with no food on its upper surface, *see* '169 Patent at 10:31-34; thus, defendants argue that the food is not cooked on the plate, but is only kept warm there. This description relates only to an embodiment and not to the invention as a whole, however, and therefore it cannot support a limitation imposed under *Microsoft*. Defendants have not offered any other citation to the patent specification. Defendants do point to a statement in the provisional application for the patent that indicates that the invented system is for temperature regulation, which defendants argue is distinct from cooking.

The Court concludes that defendants' citations to the record are insufficient. Defendants have not identified a single description—let alone a consistent and repeated description—of the invention as a whole as limited to servingware. To the contrary, the specification actually refers to the preferred embodiments as relating to "cookware", even though the only embodiments discussed appear to be described as "servingware". *See id.* at 5:39-40. Finally, under the doctrine of claim differentiation, the fact that dependent claims 2 and 38 of the '169 Patent add the limitation that the object be "food servingware" further supports rejection of the limitation urged by defendants.

Accordingly, the Court rejects defendants' proposed construction of this term, and

it concludes that no further construction of the term is warranted.

IT IS THEREFORE ORDERED BY THE COURT THAT certain terms in the patents at issue in this action are construed as set forth herein.

IT IS SO ORDERED.

Dated this 29th day of September, 2009, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge