IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

HR TECHNOLOGY, INC., )
f/k/a THERMAL SOLUTIONS, INC., )
 )
        Plaintiff, )
 )
      v. )      Case No. 08-2220-JWL
 )
IMURA INTERNATIONAL U.S.A., INC., )
VITA CRAFT CORPORATION, and )
MAMORU IMURA, an individual, )
 )
        Defendants. )
 )
_____)

## MEMORANDUM AND ORDER

      This case arises out of license agreements between plaintiff HR Technology, Inc.,

formerly known as Thermal Solutions, Inc., and Imura International USA, Inc. ("II-

USA") relating to induction-heating cooking systems. Plaintiff has brought patent

infringement claims under federal law and various other claims under Kansas law against

II-USA; a subsidiary of II-USA, defendant Vita Craft Corporation ("Vita Craft"); and

defendant Mamoru Imura, who is alleged to control both corporate defendants.

Defendants have asserted counterclaims. This matter presently comes before the Court

on defendants' motions for summary judgment on plaintiff's state-law tort and statutory

claims (Doc. # 236) and on plaintiff's contract claims (Doc. # 222), and on plaintiff's

motion to strike two affidavits submitted by defendants in support of their summary

judgment motions (Doc. # 255). As more fully set forth below, the Court **grants** both

of defendants' motions, and defendants are awarded summary judgment on plaintiff's state-law claims. The Court **denies** plaintiff's motion to strike.

## I. <u>Background</u>

On April 2, 2003, plaintiff and II-USA entered into a license agreement, referred to as the "Asia License," by which plaintiff granted II-USA an exclusive license to sell cookware products using plaintiff's technology and patents in Japan, Taiwan, and mainland China. On November 22, 2004, plaintiff and II-USA entered into a similar exclusive license agreement, referred to as the "Worldwide License Agreement," covering the rest of the world. Plaintiff asserts that defendant Vita Craft became subject to the license agreements as II-USA's assignee. On February 9, 2006, plaintiff terminated both agreements. Defendants' subsequent initiation of legal action against plaintiff in state court in Johnson County, Kansas, included obtaining an ex parte temporary restraining order against that termination.

The parties eventually chose to pursue their claims against each other in this Court instead of in the state court. In addition to its patent infringement claims under federal law, plaintiff asserts claims for breach of contract, for unfair competition, and for misappropriation of trade secrets in violation of the Kansas Uniform Trade Secrets Act, K.S.A. §§ 60-3320 et seq.

## II. <u>Summary Judgment Standards</u>

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005). To accomplish this,

sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.    Plaintiff's Motion to Strike

Plaintiff moves to strike two affidavits submitted by defendants in support of their motions for summary judgment. Plaintiff contends that certain statements in the affidavits are contradicted by other statements by the affiants and by other evidence. Regardless of the degree to which other evidence may contradict the affiants' statements, defendants are the moving parties in this instance, and thus the affidavits were not submitted by defendants in order to create evidence to withstand summary judgment against them. Accordingly, there is no need to strike the affidavits, as any contrary evidence in plaintiff's favor must be and has been credited by the Court, in accordance with the applicable summary judgment standards. For this reason, the Court denies plaintiff's motion to strike.

### IV.    Plaintiff's Unfair Competition and Trade Secrets Claims

In the pretrial order, plaintiff bases its unfair competition claim on eight separate acts by defendants alleged to have occurred after plaintiff's termination of the two license agreements. Plaintiff also alleges that defendants misappropriated its trade secrets in violation of Kansas statutory law by continuing to develop new products and offer cookware for sale after the termination of the agreements. As one basis for summary judgment on these claims, defendants argue that plaintiff has not submitted evidence that the damages it seeks were actually caused by the post-termination conduct alleged as the bases for the two claims. The Court agrees, and it therefore awards defendants summary judgment on plaintiff's state-law tort and statutory claims.

In asserting these two claims, plaintiff seeks damages in the same amount, based on the same calculations, as the damages it alternatively seeks for breach of contract. Specifically, with respect to all of its state-law claims, plaintiffs calculates its damages based on royalty payments that it allegedly would have received under the license agreements. Plaintiff's claimed damages may be divided into four categories, totaling over $38,000,000. First, plaintiff seeks $12,419,000, representing royalties that would have been due under the Asia License if defendants had sold 2.5 million pieces of cookware pursuant to a contract with Panasonic. Second, plaintiff seeks $4,247,886, representing royalties that would have been due under the Worldwide License if defendants had made certain sales to Regal Ware pursuant to a Merchandise License Agreement (the "MLA") with that company. Third, plaintiff claims that it is entitled to a $1,000,000 payment that Regal Ware made to defendants under the MLA. Fourth,

plaintiff seeks $20,500,000, representing minimum royalty payments that defendants allegedly would have paid in future years in order to maintain the exclusive licenses with respect to various territories under both agreements. Plaintiff has not assigned any of these amounts to the particular wrongful acts alleged in the unfair competition and trade secrets claims, or even to either claim generally; rather, plaintiff simply asserts that it is entitled to all of these damages for any of its state-law claims.

Plaintiff's unfair competition and trade secrets claims are based solely on allegations of post-termination conduct by defendants. Thus, defendants argue that there is no basis for plaintiff to argue that any of this alleged conduct by defendants could have caused plaintiff to lose royalties under the two license agreements. In response, plaintiff has articulated its theory that defendants' wrongful conduct after termination of the license agreements caused its inability to secure a new licensee, and that these claimed damages represent the amounts that plaintiff would have received from such a substitute licensee.

Plaintiff has not supported this theory with evidence sufficient to withstand summary judgment, however. First, plaintiff's specific damage amounts are based on the royalty terms of the specific license agreements with defendants and on the particular circumstances of defendants' relationships with Panasonic and Regal Ware. Plaintiff has submitted no evidence, however, that any license agreements with a substitute licensee would have included the same royalty terms. Nor has plaintiff submitted any evidence that the substitute licensee would have had the same contracts and experience with

Panasonic and Regal Ware (including a $1,000,000 payment from Regal Ware). Thus, there is no evidentiary basis for plaintiff's use of royalties that defendants allegedly would have owed as a measure of lost profits damages suffered from the inability to find a replacement licensee.

Moreover, plaintiff has not submitted any causation evidence linking the loss of any future royalties to the particular tortious conduct and acts of misappropriation alleged. In response to defendants' causation argument, plaintiff has cited only (a) evidence of pre-termination statements by defendants that there was interest in the product and (b) the following statements from the affidavit of Brian Clothier, plaintiff's president:

> 13. After plaintiff terminated the license agreements . . . [another employee of plaintiff] and I undertook diligent efforts to find a new licensee to replace defendants.
>
> 14. Prior to termination of the license agreements, defendants had repeatedly informed us that there was great interest in our technology and the licensed products they had developed. However, due to defendants' misconduct, this interest had completely dissipated after termination.
>
> 15. After about six months of searching and failing to find a replacement licensee, we began focusing our efforts on developing and commercializing new technology.
>
> 16. To this date, we have not been able to find a licensee for plaintiff's intellectual property portfolio for the manufacture and sale of cookware products in defendants' field of use.

Thus, plaintiff has submitted evidence that it was unable to find a new licensee. It has not submitted any evidence, however, linking that failure to any particular conduct by

defendants constituting unfair competition or misappropriation of trade secrets. Mr. Clothier's only reference to the cause of the failure is that "due to defendants' misconduct," interest in the products "had completely dissipated after termination." That single statement is not sufficient to withstand summary judgment on this basis. The statement is impermissibly conclusory and does not refer to any particular conduct by defendants on which these claims are based. For instance, there is no evidence that any particular potential licensee refused to enter into an agreement with plaintiff because of particular circumstances that could be traced to defendants's conduct. Thus, there is no evidence from which a reasonable jury could determine that any particular tortious act or violation of the trade secrets statute by defendants caused plaintiff's inability to find a new licensee (thereby causing the loss of future royalty payments). Nor does Mr. Clothier's affidavit provide any evidence that any new licensee would have had the same royalty terms and same relationships with Panasonic and Regal Ware that defendants had, as noted above.[1]

For these reasons, the Court concludes that plaintiff has failed to submit evidence from which a reasonable jury could find that any of the alleged acts of unfair competition or misappropriation of trade secrets by defendants caused the particular lost royalties sought by plaintiff. Accordingly, defendants are entitled to summary judgment on

---

[1]These claims for damages also fail as a matter of law for the reasons supporting summary judgment on plaintiff's contract claims, as set forth in the next section, relating to the particular amounts claimed by plaintiff. *See infra* Part V.

plaintiff's unfair competition and trade secrets claims.[2]

### V.    Plaintiff's Claims for Breach of Contract

Defendants also move for summary judgment on plaintiff's claims for breach of the two license agreements.  With respect to such claims, plaintiff seeks to recover royalties that defendants allegedly would have been obligated to pay under the agreements, in the amounts set forth in the preceding section.  *See supra* Part IV. Plaintiff's theory is that defendants' breaches justified its termination of the agreements, and that it therefore may recover expectation damages as the benefit of its bargain, consisting of lost profits (royalties) that it would have realized under the agreements but for the termination.[3]  *See, e.g.*, *Source Direct, Inc. v. Mantell*, 19 Kan. App. 2d 399, 408 (1994) ("A party who seeks to recover his expectation interest in the contract is asking to be given the benefit of his bargain by being put in as good a position as he would have

---

[2]In light of this ruling, the Court need not consider the other bases for summary judgment on these claims argued by defendants in their motion.

[3]In light of its conclusion that summary judgment is appropriate on plaintiff's contract claims for the reasons set for in this section, the Court declines to consider defendants' arguments that plaintiff must show causation and that plaintiff's loss of future royalties was caused as a matter of law by its termination of the agreements and not by any particular breaches of those agreements.  Moreover, the Court will not consider defendants' argument that plaintiff's damage claims must fail solely for lack of expert testimony or their argument that future royalties were not contemplated by the parties as possible damages in the event of breach, as defendants made those arguments for the first time in their reply brief.  *See, e.g.*, *U.S. Fire Ins. Co. v. Bunge N. Am., Inc.*, 2008 WL 3077074, at *9 n.7 (D. Kan. Aug. 4, 2008) (citing *Minshall v. McGraw Hill Broadcasting Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003)).

been in had the contract been performed. Expectation damages usually consist of lost profits plus any incidental or consequential losses caused by the breach.") (citations omitted).[4]

As an initial matter, the Court notes that plaintiff's theory could not apply to its claims that defendants also breached the agreements by their conduct after the termination of those agreements. Thus, with respect to such claims, plaintiff would be required to relate the claimed damages to the particular post-termination breaches alleged. Plaintiff has provided no such analysis or evidence in support of those claims. Therefore, for the reasons set forth above with respect to plaintiff's unfair competition and trade secrets claims (as well as for the reasons set forth below with respect to the claims for pre-termination breaches), defendants are entitled to summary judgment on plaintiff's post-termination breach of contract claims.

In seeking summary judgment on plaintiff's contract claims, defendants argue that plaintiff has not established its claimed damages with sufficient certainty, and that these claims for lost profits are impermissibly speculative. In that regard, defendants note that plaintiff does not simply seek to enforce an unconditional obligation of defendants to make certain payments mandated by contract. Rather, plaintiff claims royalties that never actually became due under the agreements, but that plaintiff alleges would have

---

[4]The parties have assumed that Kansas law governs plaintiff's contract claims. Because the license agreements contained Kansas choice-of-law provisions and the parties to the agreements were located in this state, the Court will apply Kansas law.

been paid by defendants over the course of the agreements. Defendants argue that plaintiff has not submitted evidence to show with sufficient certainty that defendant would have paid royalties in those amounts under the agreements (constituting the alleged benefit of the bargain).

Under Kansas law, plaintiff's claim for lost profits may not be merely speculative, but must be proven with reasonable certainty. *See Kelley Metal Trading Co. v. Al-Jon/United, Inc.*, 877 F. Supp. 1478, 1484 (D. Kan. 1995) (lost profits must be proven with "reasonable certainty") (citing *Vickers v. Wichita State Univ.*, 213 Kan. 614, 618 (1974)). The Kansas Supreme Court has offered the following explanation of the type of evidence needed to meet this standard for proving lost profits:

> Unquestionably, a method of establishing a loss of profits with reasonable certainty is by showing a history of past profitability. Past profitability of a particular business is not, however, the only method of proving lost future profits. The evidence necessary in establishing lost future profits with reasonable certainty must depend in a large measure upon the circumstances of the particular case. Absolute certainty in proving loss of future profits is not required. What is required is that the court or jury be guided by some rational standard. As to evidentiary matters a court should approach each case in an individual and pragmatic manner, and require the claimant to furnish the best available proof as to the amount of loss that the particular situation admits. It is the responsibility of a district court to see that speculative and problematical evidence does not reach the jury.

*Vickers*, 213 Kan. at 620 (citations and internal quotations omitted).

Moreover, to the extent that plaintiff seeks royalty payments that would have been due only if certain events occurred (such as purchases by Panasonic or Regal Ware or defendants' choosing to maintain exclusive licenses), plaintiff must provide sufficient

11

evidence to support a finding that such events in fact would have occurred. *See Jenkins v. T.S.I. Holdings, Inc.*, 268 Kan. 623, 630 (2000) ("if damages are contingent on the happening of some event and the plaintiffs cannot prove that contingency will occur, a damage award cannot stand").

The Court thus examines each particular element of plaintiff's claimed lost royalties to determine whether plaintiff has submitted evidence that would establish its entitlement to that amount with reasonable certainty.

### A.    *Royalties from the Panasonic Contract*

Plaintiff first claims damages in the amount of $12,419,000, representing the amount of royalties it allegedly would have received under the Asia License Agreement if defendants sold 2.5 million pieces of cookware to Panasonic.  No such sales to Panasonic actually took place.  Instead, plaintiff takes this figure from a "Memorandum", signed in July 2004, memorializing a "basic contract of partnership development" reached by Vita Craft and Panasonic in September 2003, that states as follows: "[Panasonic] has agreed to purchase the [Vita Craft] products 100,000pcs at the first year, 300,000pcs at the second year, 500,000pcs at the third year, 600,000pcs at the fourth year and 1,000,000pcs at the fifth year with average price of $120.00."

In opposition to defendants' argument that it cannot establish this damage claim with reasonable certainty, plaintiff has submitted and cited to the following evidence: (a) the Panasonic Memorandum, containing the agreement to purchase 2.5 million pieces; (b) evidence from 2004 reflecting that agreement to purchase that number of

pieces; (c) evidence of statements by Mr. Imura in 2005 that those figures could be exceeded; (d) evidence that defendants continued to work on the project with Panasonic after termination of the agreements in early 2006; and (e) evidence of statements to the state court shortly after the termination suggesting an ongoing relationship and project with Panasonic and indicating that defendants were only weeks or months away from delivering a marketable product.

The Court concludes, however, that such evidence does not make it more than merely speculative that defendants in fact would have sold 2.5 million pieces to Panasonic. It is undisputed that defendants did not make any sales to Panasonic, that defendants did not ever complete a functional system of the product intended for Panasonic, and that defendants and Panasonic failed to resolve certain technical issues that prevented completion of the project. The Panasonic Memorandum clearly indicates that the contract was for the "development" of the product, with both sides using their "best efforts to promote the development." The Memorandum contained a schedule that included releasing the product on the market in October 2005, and it further stated that "[a]ll parties have agreed to discuss and make decision, if all parties may have to change the schedule [*sic*]." The Memorandum contained Panasonic's agreement to purchase 2.5 million pieces, but it also stated that "[t]he detail such as detail prices, quantities and terms shall be discussed by all parties separately." Finally, the Memorandum stated that "[a]ll parties have agreed to discuss it if they should find any technical problems." Thus, the Memorandum indicates that any intention by Panasonic to purchase 2.5 million

13

pieces from defendants depended on the parties' resolving any technical issues with the product.

Moreover, in December 2005, Panasonic sent defendants an e-mail relating Panasonic's wish to continue the relationship and to try to resolve the existing technical issues with the product, but indicating that the Memorandum's schedule could not be met without a technical solution and that an extension of the parties' contract "would be meaningless without the prospect for the actual commercialization of the product." Accordingly, the undisputed evidence establishes that, by the time of plaintiff's termination of the Asia License in February 2006, Panasonic and defendants had already failed to meet the schedule set forth in the Memorandum and had not resolved existing technical issues.

Plaintiff does cite to evidence that defendants continued work on the project after termination of the Asia License and maintained a relationship with Panasonic. Nevertheless, plaintiff must provide evidence that defendants in fact would have overcome the technical issues and made the hoped-for sales to Panasonic. Plaintiff also cites to evidence from the state-court proceedings that defendants had an ongoing relationship with Panasonic after the termination and that they had a lot at stake under the two license agreements (representing in their TRO application to the state court that they stood to lose as much as 100 million dollars from the termination of the two license agreements).

Such evidence, however, does not establish with reasonable certainty plaintiff's

specific claim that defendants would have sold 2.5 million pieces to Panasonic. The uncontroverted evidence shows that although Panasonic agreed to purchase 2.5 million pieces, such agreement depended on resolving any technical issues with the product; that there were such technical issues, which were never resolved; and that Panasonic never purchased any pieces from defendants. Plaintiff has not submitted any evidence, showing to any degree of certainty, that defendants and Panasonic would have resolved any technical issues and that Panasonic would then have purchased at least 2.5 million pieces.

Indeed, plaintiff does not address the technical issues at all in its opposition to summary judgment. Instead, plaintiff relies on the evidence that defendants were still trying to work on the product in 2006 after termination of the license agreements. While such evidence may be sufficient to establish defendants' desire to make sales to Panasonic, it does not tend to show that such sales would have occurred. Thus, there is no reasonably certain basis for plaintiff's claim for these royalties, and submission of the claim on this evidence would be asking the jury to engage in speculation concerning whether plaintiff would have realized these particular lost profits. Accordingly, defendants are awarded summary judgment on this portion of plaintiff's damage claim.

### B.    *Minimum Royalties to Retain Exclusive Asia License*

As a separate element of its contract damages, plaintiff claims $900,000 in minimum royalty payments that it alleges defendants would have paid over three years between 2010 and 2013. Under the terms of each license agreement, if defendants did

not make certain minimum royalty payments relating to a territory, plaintiff could convert the exclusive license into a non-exclusive license for that territory. Under the Asia License, that minimum royalty amount for years after 2007 was $300,000 per year. Thus, in response to defendants' motion, plaintiff argues that the $900,000 amount is reasonably certain, as it is drawn from the agreement.

Plaintiff has not responded, however, to defendants' argument that there is no evidence that defendants in fact would have chosen to make such minimum royalty payments between 2010 and 2013. Defendants stress the uncontroverted facts that at the end of 2005, defendants chose not to pay the minimum royalties required to maintain the exclusive license under the Asia License Agreement, and that plaintiff responded at that time by exercising its right to make the Asia License non-exclusive.

The Court agrees that plaintiff has failed to submit evidence that, although defendants chose not to make the minimum payments required to retain an exclusive license, they would have done so years later. As set forth in the preceding section relating to Panasonic, there is no evidence that defendants would have overcome the technical problems that they were experiencing with the product; thus, there is no evidence that defendants would have been successful enough selling the product under the Asia License to warrant minimum payments to keep an exclusive license. Moreover, plaintiff had already converted the license to a non-exclusive one at the time of the termination in 2006; therefore, there would be no incentive in 2010 for defendants to make the minimum payments. Nor is there evidence (although plaintiff has not advanced

this theory) that defendants would owe more than $300,000 in royalties each of those years based on actual sales of the product.

Accordingly, this element of plaintiff's damage claim is impermissibly based only on speculation, and defendants are therefore entitled to summary judgment with respect to that claim.

### C. Royalties from Regal Ware Contract

Plaintiff next claims that it would have received at least $4,247,886 in royalties from defendants through 2009 under the Worldwide License Agreement, based on sales that defendants would have made to Regal Ware under the MLA between defendants and Regal Ware. Plaintiff's royalty figure is based on a figure calculated by defendants' expert witness in defendants' litigation with Regal Ware, in support of the expert's opinion regarding lost profits suffered by defendants from Regal Ware's termination of the MLA.

In seeking summary judgment on this damage claim, defendants note the uncontroverted facts that they entered into the MLA with Regal Ware in November 2004; that Regal Ware did not purchase any products from defendants after mid-2005; that Regal Ware in fact only sold two units of the product; and that Regal Ware terminated the MLA and declared it void in December 2005. Based on those facts, defendants argue that plaintiff's claim based on royalties from sales to Regal Ware is purely speculative and not reasonably certain.

In response, in addition to the report of defendant's expert in their Regal Ware litigation, plaintiff cites only the facts that defendants disputed Regal Ware's right to terminate the MLA and that defendants therefore referred to an ongoing relationship with Regal Ware in the state-court proceedings in this case. Plaintiff has not submitted any evidence from its own expert in support of its damage claims.

The Court concludes that this evidence cited by plaintiff is not sufficient to support this damage claim. Plaintiff must show that defendants in fact would have made these sales to Regal Ware, but it has submitted so such evidence. It is uncontroverted that Regal Ware attempted to end its contractual relationship with defendants prior to plaintiff's termination of the Worldwide License and that no sales were made to Regal Ware. The fact that defendants disputed Regal Ware's legal right to terminate the MLA (and thus represented to the state court that its relationship with Regal Ware was ongoing) does not provide evidence that the MLA would in fact again become effective or that Regal Ware would have emerged from litigation and decided to make purchases from defendants. Even if defendants had a claim for lost profits from Regal Ware, plaintiff has not shown that defendants would then be obligated under the Worldwide License Agreement to pay royalties on any recovery from Regal Ware.[5] Moreover, in

---

[5]In fact, according to defendants' expert report in their Regal Ware litigation, on which plaintiff relies, the expert calculated the lost profits by subtracting out royalty payments that defendants would have made to plaintiff—thus, the opinion comports with

(continued...)

its summary judgment opposition, plaintiff has not provided any evidence concerning the outcome of the litigation between defendants and Regal Ware; thus, even though defendants (and their expert) might have believed Regal Ware should have been liable for lost profits under the MLA, there is nothing to indicate whether that belief proved well-founded.

Finally, the expert opinion on which plaintiff relies was expressly based on certain assumptions, including the assumptions that Regal Ware was obligated to fulfill the MLA and that defendants would have been able to fulfill requirements and launch the product in 2005. Plaintiff has not provided any evidence that these assumptions were true; thus, the expert report cannot provide evidence that any particular amount of sales to Regal Ware would have occurred and that defendants would therefore have paid royalties for sales under the MLA.

Accordingly, plaintiff has submitted no evidence to support its contention that, despite Regal Ware's termination of the MLA and the ensuing litigation, defendants nevertheless would have made sales to Regal Ware. Therefore, plaintiff's assertion that it would have received the claimed royalties under the Worldwide License Agreement is purely speculative and is not established to a reasonable certainty, and defendants are therefore awarded summary judgment on this claim.

---

[5](...continued)
the position that defendants would not have owed anything to plaintiff out of a lost profits recovery from Regal Ware.

### D.   One Million Dollar Payment from Regal Ware

As the next element of its damage claim for breach of contract, plaintiff seeks to recover $1,000,000, based on its allegation that Regal Ware paid that amount to defendants under the MLA for exclusive rights that defendants lacked authority to sell. Plaintiff contends that defendants breached the license agreements by making that sale, and that plaintiff is therefore entitled to receive the entirety of that payment from defendants.

In support of this claim, plaintiff cites only a stipulation in litigation between defendants and Regal Ware that Regal Ware paid defendants $1,000,000 pursuant to the MLA (although the stipulation does not indicate the basis for that payment under the MLA). That evidence does not provide a basis for damages in the amount of $1,000,000 for beach of contract. That figure cannot represent an alleged benefit of the bargain for plaintiff, as plaintiff has failed to demonstrate some basis under the license agreement for the payment of that money over to plaintiff. Nor has plaintiff explained how it suffered $1,000,000 in damages relating to this breach by defendants—i.e., that because defendants sold exclusive rights without plaintiff's approval, plaintiff lost $1,000,000 that it otherwise would have received.

Plaintiff has not identified any particular legal theory supporting its claim for this amount of damages—it just contends that it is entitled to that payment from Regal Ware

to defendants.[6]  Such insistence is not sufficient to support plaintiff's claim, and defendants are therefore awarded summary judgment on that claim.

### E.    *Minimum Royalties to Retain Exclusive Worldwide License*

Finally, plaintiff claims a total of $19,600,000 as damages, representing minimum royalty payments that defendants allegedly would have made under the Worldwide License Agreement to retain an exclusive license in the various regions covered by the agreement.  First, plaintiffs seeks a total of $12,000,000 in minimum royalty payments, at $2,400,000 per year, for the five years from 2010 through 2014, for territories in the American continents.  That claim includes $1,500,000 per year for the United States, $500,000 per year for the rest of North America, and $400,000 per year for South America, as set forth in the Worldwide License Agreement.

Defendants argue that plaintiff's claim that they would have made those minimum payments is based only on speculation.  Defendants note that they refused to make such a minimum payment under the Asia License, despite their substantial investment of time and money in that product for the Japanese market.  Defendants further note that there were no actual sales (beyond the two units to Regal Ware) in these territories and that it did not conduct market research or line up distributors or gain approvals in the territories, such that one could infer that defendants would have had any reason to retain an exclusive license in these areas in the future.

---

[6]Plaintiff has not asserted a claim for unjust enrichment in this action.

In response, plaintiff notes that the MLA between defendants and Regal Ware covered these territories. As noted above, however, plaintiff did not provide evidence that Regal Ware would have made purchases from defendants under the MLA. Accordingly, the fact of the MLA does not provide evidence that defendants would have had sufficient reason in 2010 and thereafter to continue to pay minimum royalties to maintain an exclusive license for these territories. The only other evidence cited by plaintiff is testimony that defendants' employee sent a marketing letter to a Canadian company after the termination in 2006. Again, however, such meager evidence is not sufficient to show that defendants would have paid to retain exclusive rights in North America years later.

To support this claim, plaintiff must have evidence that defendants in fact would have made these minimum royalty payments, such as evidence that defendants would have been making enough sales in these territories by 2010 to persuade them to retain the exclusive license. Plaintiff has not provided any such evidence, in the form of expert opinion testimony or otherwise. Therefore, this claim by plaintiff is impermissibly speculative.

Plaintiff also seeks minimum royalty payments for the years 2007 through 2014 for particular territories under the Worldwide License in the following total amounts: $3,800,000 for Europe; $1,825,000 for Africa; $1,275,000 for Oceania; and $700,000 for Asia (excluding Japan, Taiwan, and mainland China). With respect to Europe, plaintiff has submitted various pieces of evidence indicating that in 2005 and 2006

defendants made plans for a European product, made contact with a couple of European companies, and produced demonstration models for use in Europe. Plaintiff has not provided any evidence, however, that anything ever came to fruition or that defendant actually made any sales in Europe. Nor has plaintiff provided expert or other evidence that defendants would have made sales in Europe, or that defendants would have overcome any technical issues of the type experienced with Panasonic and Regal Ware. Thus, there is no evidence, beyond that of defendants' desire for sales in Europe, that defendants would have experienced enough success there to warrant their payment of minimum royalties to maintain an exclusive license, despite choosing not to make such payments under the Asia License. Accordingly, plaintiff's claim based on the European territory is impermissibly speculative.

The same is true for plaintiff's claim with respect to the territories of Oceania and Asia. Plaintiff has submitted evidence that in 2005 and 2006 defendants had a distribution contact and plans to develop a product for Malaysia, but there is no evidence of sales there. As with Europe, there is not sufficient evidence that defendants would have had sufficient success in that area, such that plaintiff can establish its claim for lost royalty payments with reasonable certainty.

Finally, plaintiff has offered no evidence or argument to support its claim for minimum royalties relating to the territory of Africa.

For these reasons, the Court awards defendants summary judgment on plaintiff's claims for damages for breach of contract.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiff's motion to strike (Doc. # 255) is **denied**.

IT IS FURTHER ORDERED BY THE COURT THAT defendants' motion for summary judgment on plaintiff's claims of unfair competition and misappropriation of trade secrets (Doc. # 236) is **granted**, and defendants are awarded summary judgment on those claims.

IT IS FURTHER ORDERED BY THE COURT THAT defendants' motion for summary judgment on plaintiff's contract claims (Doc. # 222) is **granted**, and defendants are awarded summary judgment on plaintiff's claims for breach of contract.

IT IS SO ORDERED.

Dated this 20th day of August, 2010, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge