IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

HR TECHNOLOGY, INC.,            )
f/k/a THERMAL SOLUTIONS, INC.,   )
                                )
        Plaintiff,           )
                                )
    v.                     )     Case No. 08-2220-JWL
                                )
IMURA INTERNATIONAL U.S.A., INC.,  )
VITA CRAFT CORPORATION, and    )
MAMORU IMURA, an individual,     )
                                )
        Defendants.       )
                                )
_____)

## MEMORANDUM AND ORDER

In this case, plaintiff alleges that defendants infringed its patent (the '169 Patent), and it also seeks declaratory judgments to the effect that defendants' patent (the '675 Patent) is invalid and unenforceable. By their counterclaims, defendants allege that plaintiff breached various contracts between the parties, and defendants also seek declaratory judgments of non-infringement, invalidity, and non-enforceability with respect to certain claims of three of plaintiff's patents (the '585, '169, and '513 Patents).

The matter presently comes before the Court on plaintiff's motion for summary judgment with respect to its claim that the '675 Patent is invalid based on prior invention and anticipation (Doc. # 349). For the reasons set forth below, the Court concludes that plaintiff's declaratory judgment claims regarding the '675 Patent do not satisfy Article

III's case-or-controversy requirement, and that the Court therefore lacks subject matter jurisdiction over those claims.  Accordingly, plaintiff's motion is **denied**, and those claims are hereby dismissed.

This matter also comes before the Court on defendants' motion for summary judgment on their patent claims (Doc. # 342).  For the reasons set forth below, that motion is **granted in part and denied in part**.  The motion is granted with respect to plaintiff's claim for infringement of the '169 Patent, and with respect to defendants' claims seeking declarations that certain claims of the '585 Patent, the '169 Patent, and the '513 Patent are invalid as obvious, and defendants are awarded summary judgment on those claims.  The motion is denied with respect to defendants' claim that plaintiff's patents are unenforceable because of inequitable conduct.

## I.      Jurisdiction over Plaintiff's Claims Concerning the '675 Patent

In April 2004, defendant Mamoru Imura filed a patent application, which resulted in the issuance to Mr. Imura of United States Patent 7,157,675 ("the '675 Patent") in 2007.  Plaintiff seeks a declaratory judgment that the '675 Patent is invalid on the bases that Mr. Imura was not the true inventor, the invention was anticipated by prior art, and the invention was obvious.  Plaintiff also seeks a declaratory judgment that the '675 Patent is invalid and unenforceable because of inequitable conduct by Mr. Imura in his application to the United States Patent and Trademark Office ("PTO").  By its present

motion, plaintiff seeks partial summary judgment with respect to its claims of invalidity based on anticipation and a lack of inventorship.

In response, defendants argue that the Court lacks subject matter jurisdiction over any declaratory judgment claims relating to the '675 Patent because no case or controversy exists concerning that patent as required by Article III of the United States Constitution. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007). By its reply, plaintiff has addressed this argument and submitted evidence, including an affidavit by its principal, Brian Clothier. Thus, the Court will decide this issue of its jurisdiction based on the facts presented by the parties. *See Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) (court has wide discretion to resolve disputed jurisdictional facts without recourse to summary judgment procedure under Rule 56).

In *MedImmune*, the Supreme Court enunciated the governing standard with respect to this constitutional requirement. *See MedImmune*, 549 U.S. 118. The Federal Circuit has recently set forth that standard as follows:

> Under the [Supreme] Court's new standard, an Article III case or controversy exists when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (internal quotation marks and citation omitted). The dispute must be "definite and concrete, touching the legal relations of parties have adverse legal interests," such that the dispute is "real and substantial" and "admi[ts] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a

hypothetical state of facts." *Id.* (internal quotation marks and citation omitted).

*Arris Group, Inc. v. British Telecommunications PLC*, 639 F.3d 1368, 1373-74 (Fed. Cir. 2011) (alteration in original). The declaratory judgment plaintiff bears the burden of establishing the existence of an Article III case or controversy. *See id.* at 1373. The Court concludes that plaintiff has failed to meet that burden in this case with respect to its claims relating to the '675 Patent.

Defendants concede that they threatened to sue plaintiff or any licensee of plaintiff that produced an infringing product. Such threats by themselves do not create jurisdiction, however, as the Federal Circuit has explained:

> If a declaratory judgment plaintiff has not taken significant, concrete steps to conduct infringing activity, the dispute is neither "immediate" nor "real" and the requirements for justiciability have not been met.
>
> A party may not obtain a declaratory judgment merely because it would like an advisory opinion on whether it would be liable for patent infringement if it were to initiate some merely contemplated activity. Thus, although a party need not have engaged in the actual manufacture or sale of a potentially infringing product to obtain a declaratory judgment of non-infringement, there must be a showing of "meaningful preparation" for making or using that product.

*Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 880-81 (Fed. Cir. 2008) (internal quotations and citations omitted). In *Cat Tech*, the court described, with approval, a previous affirmance of the dismissal of a declaratory judgment claim as follows: "Because it was uncertain when, if ever, the declaratory plaintiff would engage in potentially infringing activity, the dispute did not present a case or controversy of

4

sufficient immediacy to support a declaratory judgment." *See id.* at 881 (citing *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1346-47 (Fed. Cir. 2007)).

In the present case, plaintiff has not shown that it has made any meaningful preparation to make or use any product or to engage in any other activity that would potentially infringe the '675 Patent. Plaintiff argues that all the work has essentially been done already, because defendants themselves created products under licenses granted by plaintiff. Plaintiff has not indicated any plans or intent to make or sell such products, however; to the contrary, plaintiff speaks only of its ability to license some other company to make and sell a potentially-infringing product.

Plaintiff argues that defendants' threats of suit have harmed it, thereby creating a justiciable controversy, because those threats have hindered its ability to find a licensee to make and sell the product. The Federal Circuit has made clear, however, that such harm to a purely economic interest does not satisfy the Supreme Court's requirement of an "adverse legal interest." *See Arris*, 639 F.3d at 1374-75 (citing *MedImmune*, 549 U.S. at 126-27). The court has stated:

> An "adverse legal interest" requires a dispute as to a legal right—for example, an underlying legal cause of action that the declaratory defendant could have brought or threatened to bring. In the absence of a controversy as to a legal right, a mere adverse *economic* interest is insufficient to create declaratory judgment jurisdiction.

*Id.* (footnote omitted). In *Arris*, for example, the court held that the economic injury suffered by a plaintiff from threats of infringement against its customers was insufficient

in itself to create jurisdiction.  *See id.* at 1375.  Thus, the fact that plaintiff may not be able to license technology to another company that may produce infringing products does not give rise to the required "adverse legal interest" necessary for jurisdiction.

In the face of this hurdle, plaintiff contends that its right to license its technology represents a legal interest that has been threatened.  That "right", however, does not distinguish plaintiff's case from the claim rejected in *Arris*, in which the plaintiff's legal "right" to make sales to its customer was threatened.  Rather, this requirement of an adverse legal interest may be satisfied by an underlying "legal cause of action that the declaratory defendant could have brought or threatened to bring, if not for the fact that the declaratory plaintiff preempted it."  *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1316 (Fed. Cir. 2011) (citing *Arris*, 639 F.3d at 1374-75, and *Microchip Tech. Inc. v. Chamberlain Group, Inc.*, 441 F.3d 936, 943 (Fed. Cir. 2006)).  "Without an underlying legal cause of action, any adverse economic interest that the declaratory plaintiff may have against the declaratory defendant is not a legally cognizable interest sufficient to confer declaratory judgment jurisdiction."  *Id.* (quoting *Microchip*, 441 F.3d at 943).  In this case, plaintiff has not shown that there is the potential for a legal cause of action for infringement asserted by defendants against plaintiff, as, again, plaintiff has shown no preparation or intent for using or selling a product itself.  The fact that defendants might someday have a basis to sue a licensee of plaintiff does not create declaratory jurisdiction for plaintiff.

The Federal Circuit did recognize the following exception in the analogous situation in *Arris*:

> We have recognized that, where a patent holder accuses customers of direct infringement based on the sale or use of a supplier's equipment, the supplier has standing to commence a declaratory judgment action if (a) the supplier is obligated to indemnify its customers from infringement liability, or (b) there is a controversy between the patentee and the supplier as to the supplier's liability for induced or contributory infringement based on the alleged acts of direct infringement by its customers.

*Arris*, 639 F.3d at 1375 (footnote omitted). Plaintiff has not asserted either of these bases for jurisdiction in this case, but they would not be available to plaintiff on this record at any rate. Plaintiff has not pointed to any existing license it has granted; rather, it merely claims, in an affidavit by its principal, that it tried to find a licensee during a six-month period in 2006 and that it intends to resume that search in the future if the '675 Patent is invalidated. Thus, there is no present basis for assuming plaintiff's potential liability for indemnification or for induced or contributory infringement. Jurisdiction cannot be founded on such speculation; as noted above, "[a] party may not obtain a declaratory judgment merely because it would like an advisory opinion on whether it would be liable for patent infringement if it were to initiate some merely contemplated activity." *See Cat Tech*, 528 F.3d at 881 (internal quotation and citation omitted).

The absence of an actual licensee who has itself made meaningful preparation towards the production of a potentially-infringing product also precludes plaintiff from

establishing a controversy that is "real" in this case. As the Federal Circuit has repeatedly stated with respect to the "reality" requirement: "[T]he greater the variability of the subject of a declaratory-judgment suit, particularly as to its potentially infringing features, the greater the chance that the court's judgment will be purely advisory, detached from the eventual, actual content of that subject—in short, detached from eventual reality." *See Cat Tech*, 528 F.3d at 882 (quoting *Sierra Applied Sciences, Inc. v. Advanced Energy Indus., Inc.*, 363 F.3d 1361, 1379 (Fed. Cir. 2004)). If the Court cannot consider the issues raised by an actual product for which an actual manufacturer or seller has made meaningful preparation, the Court cannot meaningfully tailor any litigation concerning the patent to actual issues in controversy.

Plaintiff insists that its ability to find a licensee has been hampered by the existence of the '675 Patent and defendants' threats of legal action against infringers. Plaintiff has not cited to any authority, however, that would support the existence of jurisdiction on that basis. In sum, "[b]ecause it [is] uncertain when, if ever, the declaratory plaintiff [will] engage in potentially infringing activity, the dispute [does] not present a case or controversy of sufficient immediacy to support a declaratory judgment." *See id.* at 881.

Finally, the Court notes that "[e]ven assuming that the immediacy and reality prerequisites for declaratory judgment relief have been met, the district court's exercise of its declaratory judgment authority is discretionary." *Cat Tech*, 528 F.3d at 883

8

(citations omitted).  Even if the threat to plaintiff's interest in licensing its technology, in the absence of an actual potential licensee identified by plaintiff, could meet the constitutional requirements for a declaratory judgment action concerning the '675 Patent, the Court would decline to exercise such jurisdiction in this case, in light of the speculative nature of the controversy.  Accordingly, the Court dismisses plaintiff's declaratory judgment claims concerning the '675 Patent for lack of subject matter jurisdiction, and it thus denies plaintiff's motion for summary judgment on those claims.[1]

## II.   Validity and Enforceability of Plaintiff's Patents

Defendants seek declaratory judgments of non-infringement, invalidity, and non-enforceability with respect to three patents held by plaintiff:  U.S. Patent No. 6,232,585 ("the '585 Patent"); U.S. Patent No. 6,320,169 ("the '169 Patent"); and U.S. Patent No. RE 42,513 ("the '513 Patent") (a reissue of U.S. Patent No. 6,953,919).[2]  By their present motion, defendants seek summary judgment with respect to their claims that the three patents are not enforceable because of inequitable conduct before the PTO and their claims that certain claims of the patents are invalid as obvious.

---

[1]In light of this ruling, the Court does not address the parties' arguments concerning the merits of plaintiff's claims.

[2]Although the amended pretrial order still refers to the '919 Patent, the parties have instead referred to the reissued '513 Patent in their briefs.  Accordingly, the pretrial order is deemed amended to substitute the '513 Patent and its claims for references to the '919 Patent and its claims.

A.      *Summary Judgment Standards*

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006).[3] An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id*. (citing *Celotex*, 477 U.S. at 325).

---

[3]The Federal Circuit applies the law of the district court's regional circuit regarding the standard for summary judgment. *See Teva Pharmaceutical Indus. Ltd. v. AstraZeneca Pharmaceuticals LP*, 661 F.3d 1378, 1381 (Fed. Cir. 2011).

If the movant carries this initial burden, the nonmovant may not simply rest upon the pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005).  To accomplish this, sufficient evidence pertinent to the material issue  "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."  *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## B.    *Judicial Estoppel*

The Court first addresses plaintiff's argument that defendants should be judicially estopped from asserting that the patents are invalid or unenforceable.  "The doctrine of judicial estoppel is based upon protecting the integrity of the judicial system by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Bradford v. Wiggins*, 516 F.3d 1189, 1194 (10th Cir. 2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).[4]

---

[4]The Federal Circuit has held that "[w]hether judicial estoppel applies is a matter
(continued...)

11

> The doctrine [of judicial estoppel] applies when (1) a party takes a position clearly inconsistent with an earlier-taken position; (2) adopting the later, inconsistent position would create an impression that either the earlier or the later court was misled; and (3) allowing the party to change [its] position would give [it] an unfair advantage.

*Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1227 (10th Cir. 2011).  "[T]he position to be estopped must generally be one of fact rather than one of law or legal theory."  *Kaiser v. Bowlen*, 455 F.3d 1197, 1204 (10th Cir. 2006) (quoting *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005)).  The Tenth Circuit applies this doctrine "both narrowly and cautiously."  *See Hansen*, 641 F.3d at 1227 (quoting *Bradford*, 516 F.3d at 1194 n.3).  "[J]udicial estoppel is 'an equitable doctrine invoked by a court at its discretion.'"  *Kaiser*, 455 F.3d at 1204 (quoting *New Hampshire*, 532 U.S. at 750).

Plaintiff argues that defendants should be judicially estopped from challenging the enforceability and validity of plaintiff's patents because of positions taken by defendants in litigation in state court and in litigation of the *Regal Ware* case in this Court.  Specifically, plaintiff notes that defendants argued in those cases that their license agreements (which included licenses of these and other patents) were valid and enforceable, and plaintiff contends that that position is inconsistent with their position in this case concerning the patents.

---

[4](...continued)
of regional circuit law."  *See Minnesota Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1302-03 (Fed. Cir. 2002) (citation omitted).  Thus, the Court applies Tenth Circuit law in considering plaintiff's assertion of judicial estoppel.

The Court has little trouble rejecting this assertion of judicial estoppel by plaintiff, as plaintiff has failed to show that defendants took any position in the prior litigation concerning the enforceability or the validity of these three patents. Defendants' *legal* arguments in the prior litigation that plaintiff improperly terminated its license agreements with defendants and that Regal Ware had breached a license agreement does not necessarily include any *factual* position concerning the patents (one subject of the license agreements). Contrary to plaintiff's argument, challenging the invalidity of the patents is not inconsistent with seeking to keep the contracts in force, as the contracts could have been valid whether or not any particular patents were invalid. Given the narrow application of this doctrine demanded by the Tenth Circuit, the Court in its discretion declines to find that defendants should be judicially estopped from challenging the patents in this case.

### C.      *Inequitable Conduct*

Defendants seek summary judgment on their claim that the three patents held by plaintiff are unenforceable because of inequitable conduct before the PTO. Specifically, defendants argue that the inventor, Brian Clothier, who is plaintiff's principal, should have disclosed to the PTO as prior art a Motorola White Paper on which Mr. Clothier relied in drafting the patents.

Inequitable conduct regarding any claim in a patent renders the entire patent

unenforceable.  *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288

(Fed. Cir. 2011).  Last year, in *Therasense*, the Federal Circuit "tighten[ed] the standards

for finding both intent and materiality" as required for a finding of inequitable conduct.

*See id.* at 1290.  The Federal Circuit described the intent requirement as follows:

> To prevail on a claim of inequitable conduct, the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO.  A finding that the misrepresentation or omission amounts to gross negligence or negligence under a "should have known" standard does not satisfy this intent requirement.  In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a *known* material reference.  In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it.
>
> . . .
>
> Intent and materiality are separate requirements.  A district court should not use a "sliding scale," where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa.  Moreover, a district court may not infer intent solely from materiality.  Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality.  Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive.
>
> Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence.  However, to meet the clear and convincing standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence.  Indeed, the evidence must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances.  Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found.  . . .
>
> Because the party alleging inequitable conduct bears the burden of

14

> proof, the patentee need not offer any good faith explanation unless the
> accused infringer first proves a threshold level of intent to deceive by clear
> and convincing evidence.  The absence of a good faith explanation for
> withholding a material reference does not, by itself, prove intent to
> deceive.

*Id.* at 1290-91 (internal quotations and citations omitted).  The court further described

the materiality requirement as follows:

> This court holds that, as a general matter, the materiality required
> to establish inequitable conduct is but-for materiality.  When an applicant
> fails to disclose prior art to the PTO, that prior art is but-for material if the
> PTO would not have allowed a claim had it been aware of the undisclosed
> prior art.  Hence, in assessing the materiality of a withheld reference, the
> court must determine whether the PTO would have allowed the claim if
> it had been aware of the undisclosed reference.   In making this
> patentability determination, the court should apply the preponderance of
> the evidence standard and give claims their broadest reasonable
> construction.  Often the patentability of a claim will be congruent with the
> validity determination—if a claim is properly invalidated in district court
> based on the deliberately withheld reference, then that reference is
> necessarily material because a finding of invalidity in a district court
> requires clear and convincing evidence, a higher evidentiary burden than
> that used in prosecution at the PTO.  However, even if a district court does
> not invalidate a claim based on a deliberately withheld reference, the
> reference may be material if it would have blocked patent issuance under
> the PTO's different evidentiary standards.

*Id.* at 1291-92 (citations omitted).

In the prior art reference at issue—the White Paper—Motorola discussed uses for

its Radio Frequency Identification (RFID) products.  The White Paper does not include

any reference to the combination of RFID and induction heating—the key issue

regarding obviousness in this case, according to defendants.  Nevertheless, defendants

argue that the White Paper is material because it lists over 30 possible uses for RFID

(thus supporting the idea that RFID can be used with *any* host system) and discusses the use of RFID for exclusion, location, and control (features of the inventions cited by Mr. Clothier).  Defendants further argue that the White Paper is material because Mr. Clothier learned much about RFID technology from the White Paper; he relied on and copied from the White Paper in drafting the patents' specifications; and the patents' preferred embodiments for those inventions used specific Motorola products discussed in the White Paper.  With respect to the issue of intent, defendants rely on the fact that Mr. Clothier did cite the White Paper in drafts of the patents before removing that citation (while leaving the information taken from the White Paper) in the patent applications.

The Court concludes, however, under the Federal Circuit's newly-heightened standard for inequitable conduct, that a question of fact remains concerning whether Mr. Clothier had the specific intent to deceive the PTO in removing the citation to the White Paper.  Mr. Clothier testified that his patent attorney removed the citation to the White Paper because that reference was cumulative or merely provided background information, in the sense that its information was already described in the known prior art concerning RFID and that it did not include any mention of the application of RFID to induction heating.  Defendants argue that the White Paper is a unique reference because Mr. Clothier relied on it so heavily, and they dispute that the information is merely cumulative.  The Court must credit Mr. Clothier's testimony at this summary

judgment stage, however, and that testimony supports a reasonable inference that Mr.

Clothier did not remove the citation to the White Paper with the specific intent to deceive

the PTO.  Under the *Therasense* standard, such a reasonable inference precludes a

finding that defendants' have shown, by clear and convincing evidence as a matter of

law, that Mr. Clothier had the specific intent to deceive the PTO.  Accordingly,

defendants are not entitled to summary judgment on their inequitable conduct claims,

and defendants' motion is denied to that extent.[5]


     *D.*     *Obviousness*

     1.     STANDARDS AND FRAMEWORK

Defendants seek summary judgment on their claim that certain claims of the three

patents are invalid as obvious.[6]  Specifically, defendants seek to invalidate as obvious

Claims 1-7, 24, and 25 of the '585 Patent; Claims 1-4, 10-12, 15-33, 36-39, 48, 49, 55,

and 56 of the '169 Patent; and all of the claims (Claims 1-21) of the '513 Patent.

35 U.S.C. § 103 provides:

> A patent may not be obtained . . . if the differences between the subject
> matter sought to be patented and the prior art are such that the subject

---

[5]In light of this ruling, the Court need not resolve whether the White Paper is material as a matter of law.

[6]In their opening brief, defendants refer to their claim that the patents are invalid as anticipated pursuant to 35 U.S.C. § 102, although their analysis, including under the Supreme Court's opinion in *KSR*, is based on the issue of obviousness.  Accordingly, the Court has not separately considered the issue of anticipation.

matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Because these patents are presumed to be valid, defendants bear the burden of proving that the patents were obvious by clear and convincing evidence. *See Power-One, Inc. v. Artesyn Technologies, Inc.*, 599 F.3d 1343, 1351 (Fed. Cir. 2010). If the PTO did not have all material prior art references before it, defendants' clear-and-convincing-evidence standard may be easier to satisfy. *See Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2251 (2011). "The determination of obviousness under 35 U.S.C. § 103 is a legal question based on underlying questions of fact." *Power-One*, 599 F.3d at 1351. Summary judgment is appropriate when "the factual inquiries into obviousness present no genuine issue of material facts." *See Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011) (quoting *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 716 (Fed. Cir. 1991)).

In *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), the Supreme Court reaffirmed the applicable framework in evaluating obviousness under Section 103 that it had previously set forth in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966). *See KSR*, 550 U.S. at 406. That framework is as follows:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be

utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Id.* (quoting *Graham*, 383 U.S. at 17-18); *see also Tokai*, 632 F.3d at 1367-70 (applying *Graham* four-factor analysis).

## 2.    FACTORS NOT IN DISPUTE

As a preliminary matter, the Court notes that there is no issue of fact with respect to the third *Graham* factor, as plaintiff does not dispute (for purposes of this motion) defendants' evidence that with respect to these three patents, a person of ordinary skill in the art would be a person with a bachelors degree in electrical engineering or a related field, who would understand the principles of electricity and magnetism used in RFID and induction heating.  There is also no issue of fact with respect to the fourth *Graham* factor, secondary considerations.  Plaintiff argues in its response that the commercial success of its products weighs against a finding of obviousness.  As defendants point out, however, in opposing discovery of certain financial records relating to its sales, plaintiffs represented to the Court that it was not relying on its commercial success as evidence of nonobviousness.  Thus, plaintiff will not be permitted to rely on such evidence at this time.  Accordingly, the issue of the three patents' obviousness turns on the first two *Graham* factors—the scope and content of the prior art and the differences between that art and the claims at issue.

## 3.    THE PATENTS AT ISSUE

The Court begins that analysis by describing the patents at issue.  The '585 Patent,

19

issued May 15, 2001, is entitled "Temperature Self-Regulating Food Delivery System."

The patent states that the invention pertains to

> food delivery systems which include a magnetically heatable thermal storage device within a food-holding container, wherein the storage device may be selectively heated within said container by an induction charging station. In preferred forms, the charging station indefinitely maintains the selectively heated portion of the thermal storage device at a user-selected regulation temperature by using contact-less feedback from said device.

('585 Patent at 1:14-22.) A preferred embodiment is a pizza delivery bag, and the patent describes using Radio Frequency Identification (RFID) technology, whereby an RFID reader, associated with the induction heater, sends a signal to and receives information from an RFID tag associated with the food container. The patent includes the following independent claims that are at issue here:

> 1.   Apparatus comprising:
> a magnetic induction heater including a magnetic field generator for generating a magnetic field, said heater having an RFID reader associated therewith;
> an object to be magnetically heated including an induction heatable element and an RFID tag, and
> said heater having a microprocessor operably connected with said RFID reader for initiating the heating of said object only upon placement of said object proximal to said heater and in a position for RF communication between said tag and said reader, and for controlling the operation of said heater in response to information received from said tag.
>
> 24.   In a magnetic induction heating assembly including a magnetic induction heater having a magnetic field generator and an object to be magnetically heated including an induction heatable element, the improvement which comprises an RFID tag associated with said object, and RFID tag reader associated with said heater, and a microprocessor operably coupled with the reader for at least in part controlling the heating

20

of the object in response to information received by the reader from the RFID tag, when the object is placed proximal to the heater in a position for RF communication between the tag and reader, and heating of the object is initiated.

Moreover, the Court has construed certain terms within the '585 Patent. The term "an object to be magnetically heated including an induction heatable element and an RFID tag" means *a food delivery container to be magnetically heated that includes an induction heatable element and an RFID tag*. The term "an induction heatable element" means *an element made of a material capable of being magnetically heated*.

The '169 Patent, issued November 20, 2001, is entitled "Method and Apparatus for Magnetic Induction Heating Using Radio Frequency Identification of Object to Be Heated." The patent describes its invention as follows:

> The present invention is broadly concerned with magnetic induction heating systems and methods wherein an induction heatable object not physically connected to a magnetic induction heater can be heated and temperature regulated using Radio Frequency Identification (RFID) technology. More particularly, the invention is concerned with such systems, as well as the individual components thereof, wherein objects to be heated are equipped with RFID tags and the induction heaters include RFID readers; when a tagged object such as servingware is placed on a heater, the tag transmits information such as the class of object being heated, and the heater control circuitry uses the information to initiate and carry out an appropriate heating cycle for heating and temperature-regulating the object. In preferred forms, two-way transmissions between the tag and a reader/writer is established, with each having electronic memory to store relevant heating information. More precise temperature regulation is achieved using an RFID tag having an associated switch responsive to an external condition such as temperature experienced by the switch. The invention is applicable to virtually any type of induction heatable object.

('169 Patent at 1:12-33.)  The preferred embodiments include servingware such as a "sizzle plate" used in restaurants.  The patent includes the following independent claims at issue here:

> 1.  For use with an induction heating device, an induction heatable object including a component which will be heated when subjected to a magnetic field, and an RFID tag operably coupled with said object, said tag having electronic memory, there being digital electronic information stored in said memory pertaining to the induction heating history previously experienced by said object, said tag operable to transmit said information when interrogated by an RFID tag reader, said tag also operable to store updated information received from a tag writer.

> 11.  In an induction heating device including a component for generating a magnetic field in order to inductively heat an object, control circuitry operably coupled with said generating component for selective operation thereof to vary the magnitude of said magnetic field, the improvement which comprises apparatus coupled with said circuitry for transmitting information to and receiving digital information from an RFID tag associated with said object, said control circuitry operable to reduce the magnitude of said magnetic field during the times that said apparatus is transmitting or receiving said digital information.

> 18.  The combination comprising:
> an induction heating device comprising a component for generating
> > a magnetic field in order to inductively heat [an] object, control circuitry operably coupled with said generating component for selectively altering the magnitude of the generated magnetic field, and apparatus coupled with said circuitry for receiving information from an RFID tag associated with said object; and
>
> an induction heatable object including a component which will be heated
> > when subjected to a magnetic field, and an RFID tag operably coupled with said object,
>
> said RFID tag being operable to transmit information, and said apparatus
> operable to receive said information,
>
> the operation of said device during the induction heating of said object
> > being at least in part responsive to said information received from said RFID tag.

22

23.   The combination comprising:

an induction heating device comprising a component for generating a magnetic field in order to inductively heat an object, control circuitry operably coupled with said generating component for selective operation thereof to vary the magnitude of said magnetic field, and an RFID tag reader coupled with said circuitry; and

an induction heatable object including a component which will be heated when subjected to said magnetic field, and an RFID tag operably coupled with said object,

said control circuitry operable to reduce the magnitude of said magnetic field during the times that said tag is transmitting said information to said reader.

24.  The combination comprising:

an induction heating device comprising a component for generating a magnetic field in order to inductively heat an object, control circuitry operably coupled with said generating component for selective operation thereof to vary the magnitude of said magnetic field, and an RFID tag reader coupled with said circuitry, said RFID tag reader including a transmitting antenna, there being no ground plane associated with said transmitting antenna; and

an induction heatable object including a component which will be heated when subjected to said magnetic field, and an RFID tag operably coupled with said object.

25.   A method of heating an induction heatable object comprising the steps of:

providing an induction heatable object having an RFID tag operably coupled thereto;

placing said object adjacent a magnetic induction heater, said heater comprising a component for generating a magnetic field in order to inductively heat said object, control circuitry operably coupled with said generating component for selectively altering the magnitude of the generated magnetic field, and apparatus coupled with said circuitry for receiving information from an RFID tag associated with said object; and

causing said RFID tag to transmit information to said apparatus for receipt thereby, and allowing said apparatus and control circuitry to control the operation of said component in at least partial response to the information transmitted by said RFID tag and

received by said apparatus.

36.   In an induction heating device including a component for generating a magnetic field in order to inductively heat an object, control circuitry operably coupled with said generating component for selective operation thereof to vary the magnitude of said magnetic filed, the improvement which comprises apparatus coupled with said circuitry for transmitting information to and receiving digital information from an RFID tag associated with said object, said apparatus comprising a transmitting antenna, said transmitting antenna having no ground plane associated therewith.

37.   The combination comprising:
an induction heating device comprising a component for generating a magnetic field in order to inductively heat an object, control circuitry operably coupled with said generating component for selective operation thereof to vary the magnitude of said magnetic field, and an RFID tag reader coupled with said circuitry; and
an induction heatable object including a component which will be heated when subjected to said magnetic field, and an RFID tag operably coupled with said object,
said tag having electronic memory, there being digital electronic information stored in said memory pertaining to the induction heating history previously experienced by said object, said tag operable to transmit said information when interrogated by said RFID tag reader.

The '513 Patent, reissued July 5, 2011, is entitled "RFID-Controlled Smart Range and Method of Cooking and Heating."  The patent describes the invention as "[a] system and method for providing multiple cooking modes and an ability to automatically heat cooking vessels and other objects using RFID techology, and an ability to read and write heating instructions and to interactively assist in their execution."  ('513 Patent at Abstract.)  The patent includes the following independent claims:

1.   A method of heating a vessel using a range having an RFID reader,

24

wherein the vessel includes an RFID tag and a temperature sensor, the method comprising the steps of:

(a)  reading a set of heating instructions from an external storage medium separate from said vessel and selected from the group consisting of a recipe card and a food package, wherein the heating instructions include a sequence of one or more heating steps, with at least one of the heating steps including a desired temperature;

(b)  detecting the vessel and identifying vessel information;

(c)  reading the actual temperature of the vessel from the RFID tag;

(d)  determining a temperature differential between the desired temperature of the set of heating instructions and the actual temperature; and

(e)  controlling heating of the vessel based at least in part upon the temperature differential.

16.   A method of heating a vessel using an induction range having an RFID reader/writer, wherein the vessel includes an RFID tag and a temperature sensor, the method comprising the steps of:

(a)  reading a set of heating instructions from an external storage medium separate from said vessel and selected from the group consisting of a recipe card and a food package, wherein the heating instructions include a sequence of one or more heating steps, with at least one of the heating steps including a desired temperature;

(b)  detecting the vessel and writing the set of heating instructions to the vessel RFID tag;

(c)  reading the actual temperature of the vessel from the RFID tag;

(d)  determining a temperature differential between the desired temperature of the set of heating instructions and the actual temperature; and

(e)  controlling heating of the vessel based at least in part upon the temperature differential.

21.   A method of heating a vessel using a range having an RFID reader, wherein the vessel is on said range and the vessel includes an RFID tag and a temperature sensor operably coupled with the RFID tag so that information about the actual temperature of the vessel sensed by said sensor is received by said RFID tag, the vessel RFID tag storing information confirming the presence of said RFID tag and said temperature sensor, the method comprising the steps of:

(a)  loading heating instructions onto said reader from a recipe card, food

25

package, or other item separate from the vessel, including one or more heating steps including a desired vessel regulation temperature;

(b)  heating said vessel by (i) reading the temperature of the vessel from the vessel's associated RFID tag; (ii) determining a temperature differential between said desired temperature and the vessel temperature; and (iii) controlling the heating of said vessel based upon the temperature differential and said heating instructions,

said heating step being carried out only if said reader detects the presence of a suitable vessel.

### 4.    PLAINTIFF'S GENERAL OBJECTIONS

Defendants argue that the separate concepts of cooking by induction heating and using RFID technology are both well-documented in the prior art. Thus, defendants generally frame the relevant question in this case as one asking whether the *combination* of induction heating and RFID technology, which combination is used in the three patents, was obvious in light of the prior art under the Supreme Court's analysis in the *KSR* case.

Plaintiffs object to this general approach, and they argue that defendants' motion should be denied simply because they have not conducted a separate obviousness analysis for each claim of the three patents. The Court rejects this argument by plaintiff. In its statement of facts, defendants have proceeded through each independent claim of each patent, contending that each particular limitation may be found in the prior art, as supported by citation to particular prior art references. Plaintiff does not dispute defendants' contention that the separate concepts of induction heating and RFID communication are well-known in the prior art; rather, in response to defendants' factual

26

contentions that each separate limitation may be found in the prior art, plaintiff generally responds by reference to its argument that the combination of the elements of induction heating with elements of RFID communication was not obvious. Thus, the Court does not find fatally deficient defendants' approach of addressing the obviousness of the combination of those concepts and then addressing any other alleged novelty in the claims.

Plaintiff also argues that defendants cannot prevail because they have only sparingly cited to their expert's report and have not relied in their argument on that expert's opinion of obviousness. The Court rejects this basis for summary denial of the motion as well. In *KSR*, the Supreme Court rejected the argument that summary judgment must be supported by non-conclusory opinions by an expert. *See KSR*, 550 U.S. at 426-27. The Court concluded:

> In considering summary judgment on that question [of obviousness] the district court can and should take into account expert testimony, which may resolve or keep open certain questions of fact. That is not the end of the issue, however. The ultimate judgment of obviousness is a legal determination. Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate.

*Id.* at 427 (citation omitted). Thus, the extent to which defendants may or may not have relied on their expert to support their motion is not determinative.

5.    PRIOR ART AND DIFFERENCES TO PATENTS

Defendants rely on five prior art references, which the Court describes in turn.[7]

a.   <u>The Motorola White Paper</u>.  Defendants' first reference is the Motorola White Paper, discussed above, on which Mr. Clothier relied for his understanding of RFID technology and its capabilities, and which Mr. Clothier excerpted in drafting the patents' specifications.  The White Paper was not before the PTO.  The White Paper contains no reference to the use of RFID with induction heating or any other method of cooking.  Defendants argue that by listing over 30 possible specific applications for RFID technology, the White Paper suggests that the technology may be used for any possible application.  The Court cannot conclude as a matter of law, however, that such a list of applications in the White Paper makes the combination of RFID with induction heating any more obvious.

The Court also rejects plaintiff's argument that the White Paper in fact teaches away from the use of RFID with induction heating.  It is true that the White Paper warns that communication systems are generally subject to interference from unwanted electromagnetic noise.  As defendants note, however, the White Paper proceeds to explain that its system is not as sensitive to noise, and nowhere does the White Paper counsel against using RFID in the presence of electromagnetic systems.

b.   <u>The Harnden Patent ('178), Issued June 26, 1973</u>.  The Harnden Patent is

---

[7]Plaintiff does not dispute that these references are properly considered prior art for these patents.

entitled "Induction Cooking Appliance Including Cooking Vessel Having Means for Wireless Transmission of Temperature Data." This patent was cited to the PTO in the application process for these patents. Harnden discloses the use of a radio frequency transmitter in an object to be heated, to send radio waves indicating the temperature of the object to a receiver in an induction heater. The present patents differ from Harnden by using the specific RF technology of RFID and by providing for the transmission of data other than temperature, such as the type of object to be heated. Moreover, as plaintiff points out, in Harnden, the temperature could then be monitored on a display, but that patent does not discuss the use of the temperature information to control automatically the induction heater, as in the patents at issue here.

c.    The Wauer Patent ('463), Issued June 13, 2000. The Wauer Patent is entitled "Apparatus for Wirelessly Transmitting the Temperature and an Identifying Characteristic of a Cooking Pot to a Stove." This patent was not considered by the PTO in the prosecution of the instant patents. Wauer discloses the wireless communication of temperature and object-identity information from a pot to a stove. Wauer does not disclose the use of a particular type of stove, such as the induction heater at issue in the present patents. Nor does Wauer refer to the use of the transmitted information to control the induction heater automatically.

In Wauer, the wireless RF technology disclosed is surface accoustical wave (SAW) communication. Although Wauer does not contain any reference to RFID

29

technology, defendants cite to their expert's opinion[8] and other evidence indicating that a SAW tag is a type of RFID tag, referred to in the industry as an "RFID SAW" tag. Plaintiff disputes that SAW is a type of RFID technology, and plaintiff notes that its inventions use a chip-based RFID technology distinct from the technology in Wauer. The Court previously rejected plaintiff's proposed construction of "RFID" as limited to RFID using an integrated circuit, however. Moreover, plaintiff has not cited to any evidence controverting defendants' evidence that SAW is a type of RFID technology.

Wauer cites to two patents that involve induction cooking (Peters and Bowers). Wauer also cites to a German patent that discloses the wireless control of an induction heater, including the technique of halting the induction heating field when the object is communicating with the heater.

d.   The Harris Patent ('114), Issued May 5, 1998. The Harris Patent is entitled "Intelligent Cooking System with Wireless Control." This patent was not considered by the PTO. Harris discloses the use of transceivers to communicate wirelessly, by radio frequency, temperature and object-identity information to control cooking. Thus, the patents at issue differ by using transceivers that employ the specific RF technology of RFID. Plaintiff insists that Harris is confusing with respect to whether it actually discloses control of the cooking system, but the patent starts out by describing its

---

[8]Plaintiff notes that the expert report to which defendants cite is not sworn; plaintiff cited to the expert's sworn deposition testimony, however, in which the expert discussed his opinion concerning SAW RFID.

invention as relating to "intelligent cooking systems . . . for recognizing and controlling the temperature of different cooking implements . . . placed on and moved to different heating surfaces of a cooking range."

Plaintiff would also argue that the present patents differ by specifically using induction heating. At one place in the patent's specification, Harris refers to "[a] radiant heating unit . . ., such as a tungsten halogen lamp or inductive heating unit . . . ." Plaintiff argues that this reference to induction heating is incorrect because, as conceded by defendants' expert, induction heating is *not* in fact a type of radiant heating. Nevertheless, the patent does contain a reference to induction heating in the context of the wireless use of RF to communicate temperature and object-identity information to control cooking.

    e.    The Smrke Patent ('900), Issued September 14, 1999. The Smrke Patent, which was before the PTO, is entitled "Automatic Temperature Measurement Based Power Control Device." Smrke discloses the use of temperature data from a sensor, transmitted wirelessly by RF, to control cooking. Smrke does not disclose the transmission and use of other data, such as object-identity data, to control the cooking, although it does refer to the possible problem presented by the fact that the power required for cooking may depend on the size of the pot and other factors.

    6.    *KSR* OPINION

As noted above, plaintiff does not dispute that the separate concepts of induction

31

heating and RFID technology are well-known in the prior art, but plaintiff argues that the way in which its patents combine those concepts was not obvious from the prior art. The Court must then consider the teaching of the Supreme Court in *KSR* with respect to the combination of elements known in the prior art.

In *KSR*, the Federal Circuit had applied its "teaching, suggestion, or motivation" test (TSM test) "under which a patent claim is only proved obvious if some motivation or suggestion to combine the prior art teachings can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art." *KSR*, 550 U.S. at 407 (citations and internal quotation omitted). The Supreme Court rejected that "rigid approach" in favor of "an expansive and flexible approach." *Id.* at 415. The Court summarized its prior caselaw and the attendant policy considerations as follows:

> Neither the enactment of § 103 nor the analysis in *Graham* disturbed this Court's earlier instructions concerning the need for caution in granting a patent based on the combination of elements found in the prior art. For over a half century, the Court has held that a patent for a combination which only unites old elements with no change in their respective functions obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This is a principal reason for declining to allow patents for what is obvious. The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.

*Id.* at 415-16 (citation and internal quotation omitted).

The Court then reviewed its prior caselaw. The Court noted that in a 1966 case, it had "recognized that when a patent claims a structure that is altered by the mere

32

substitution of one element for another known in the field, the combination must do more than yield a predictable result;" and in the same case, it had "relied upon the corollary principle that when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *Id.* at 416 (citing *United States v. Adams*, 383 U.S. 39, 50-51, 51-52 (1966)). The Court further noted that it had elaborated on this approach in a 1969 case, in which it concluded that a device combining two pre-existing elements—a burner and a paving machine—did not create a new synergy, as both the burner and the paving machine performed just as they were expected to function, and that the two in combination did no more than they would in sequence. *See id.* at 416-17 (citing *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 60-62 (1969)). In that case, "while the combination of old elements performed a useful function, it added nothing to the nature and quality of the radiant-heat burner already patented, and the patent failed under § 103." *Id.* at 417 (quoting *Anderson's-Black Rock*, 396 U.S. at 62) (internal quotation omitted). Finally, the Court noted that in a 1976 case it had concluded from its previous precedents that when a patent "simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* (quoting *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282 (1976)) (internal quotation omitted). The Court summed up these cases as follows:

The principles underlying these cases are instructive when the question is whether a patent claiming the combination of elements of prior art is obvious.  When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.  For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.  *Sakraida* and *Anderson's-Black Rock* are illustrative—a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions.

Following these principles may be more difficult in other cases than it is here because the claimed subject matter may involve more than the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement.

Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.  To facilitate review, this analysis should be made explicit.  As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.

*Id.* at 417-18 (citation omitted).

The Court then explained its rejection of the TSM test:

[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art.  Although common sense directs one to look with care at a patent application that claims as innovation the combination of two known

34

devices according to their established functions, it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.

Helpful insights, however, need not become rigid and mandatory formulas; and when it is so applied, the TSM test is incompatible with our precedents. The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents. The diversity of inventive pursuits and of modern technology counsels against limiting the analysis in this way. In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends. Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility.

*Id.* at 418-19.

The Court then commented on the flaws that resulted from the Federal Circuit's narrow inquiry. *See id.* at 419-21. The Court began as follows:

In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim. If the claim extends to what is obvious, it is invalid under § 103. One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of the invention a known problem for which there was an obvious solution encompassed by the patent's claims.

*Id.* at 419-20. The Court then identified the Federal Circuit's first error:

The first error of the Court of Appeals in this case was to foreclose

35

> this reasoning by holding that courts and patent examiners should look
> only to the problem the patentee was trying to solve. The Court of
> Appeals failed to recognize that the problem motivating the patentee may
> be only one of many addressed by the patent's subject matter. The
> question is not whether the combination was obvious to the patentee but
> whether the combination was obvious to a person with ordinary skill in the
> art. Under the correct analysis, any need or problem known in the field of
> endeavor at the time of invention and addressed by the patent can provide
> a reason for combining the elements in the manner claimed.

*Id.* at 420 (citation omitted). The Federal Circuit's second error "lay in its assumption

that a person of ordinary skill attempting to solve a problem will be led only to those

elements of prior art designed to solve the same problem." *See id.* The Court concluded:

"Common sense teaches, however, that familiar items may have obvious uses beyond

their primary purposes, and in many cases a person of ordinary skill will be able to fit the

teachings of multiple patents together like pieces of a puzzle." *See id.* The Court

described the third error as follows:

> The same constricted analysis led the Court of Appeals to conclude,
> in error, that a patent claim cannot be proved obvious merely by showing
> that the combination of elements was "obvious to try." When there is a
> design need or market pressure to solve a problem and there are a finite
> number of identified, predictable solutions, a person of ordinary skill has
> good reason to pursue the known options within his or her technical grasp.
> If this leads to the anticipated success, it is likely the product not of
> innovation but of ordinary skill and common sense. In that instance the
> fact that a combination was obvious to try might show that it was obvious
> under § 103.

*Id.* at 421. Finally, the Court stated that the Federal Circuit had gone too far in

attempting to avoid "hindsight bias" in evaluating the patents:

> A factfinder should be aware, of course, of the distortion caused by

36

> hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning. Rigid preventative rules that deny factfinders recourse to common sense, however, are neither necessary under our case law nor consistent with it.

*Id.* (citation omitted).

The Court then concluded that the patent claims at issue in that case were obvious in light of various prior art references and the fact that one skilled in the art would have seen the benefit of improving on the inventions in the prior art. *See id.* at 422-27. The Court noted that no secondary factors had been shown to dislodge that determination of obviousness. *See id.* at 426. The Court concluded that the patent claims were obvious despite any presumption of validity, which was "much diminished" in light of the fact that the key prior art reference had not been disclosed to the patent examiner. *See id*. Finally, as discussed above, the Court concluded that summary judgment was appropriate in that case despite the lack of any non-conclusory expert opinion concerning obviousness. *See id.* at 426-27.

### 7.    ANALYSIS AND APPLICATION OF *KSR*

The Court thus applies the teachings of *KSR* in determining whether the combination of RFID and induction heating—two separate technologies well-known in the prior art—was obvious in light of the prior art cited by defendants. The Court concludes that clear and convincing evidence establishes that that combination was obvious as a matter of law.

As detailed above, Harnden, Wauer, Harris, and Smrke all disclosed the use of

wireless RF communication to transmit at least temperature data to a receiver associated with a cooking device.  Plaintiff argues that its inventions also involve induction heating, the transmission of other data such as object-identity information, and the use of the data to control the cooking process automatically.  All of those elements had been disclosed in the prior art, however—Harnden disclosed the use of induction heating, Harris referred to induction heating, and Wauer cited to other patents involving induction heating; Wauer and Harris disclosed the transmission of object-identity information; and Harris and Smrke disclosed the use of transmitted data to control the cooking process automatically.  These references make the combination of these elements obvious.

Plaintiff's inventions also use RFID, and plaintiff argues that no reference combines RFID with induction heating.  Harnden disclosed RF communication with an induction heater, however, and Wauer disclosed the use of SAW RFID—a type of RFID, or at the least, a close relative—with a cooking system, while also citing to patents involving induction heating.  The benefits of using RFID—as set out in the Motorola White Paper, for example—make RFID an obvious alternative (among a finite number of alternative wireless communication systems) to other forms of RF communication that one skilled in the art would try, with predictable results.  In plaintiffs' inventions, induction heating works as induction heating is expected to work, and RFID works as RFID is expected to work—thus, as in the cases cited in *KSR*, the combination of old elements yielded predictable results.  The White Paper extolled the benefits of using

RFID in other applications; such an improvement is logically and obviously transported into the field of induction heating that uses wireless RF communication.

Plaintiff argues that, even if the combination of induction heating and RFID were obvious, the inventions in the '585 and '169 Patents must be considered as a whole and include three non-obvious benefits. One such benefit—the use of transmitted information to control the cooking process automatically—has already been addressed (such control was disclosed in Harris and Smrke). Another benefit urged by plaintiff is that "edge effect heating" is avoided by proper placement of the heated object on the center of the induction heater. That feature is not present in the patents' claims, however. The claims speak of placement of the object "proximal" to the heater and "in a position for RF communication," but there is no requirement that the object be centered above the heater. Moreover, centering the cooking pot over the heater would certainly have been obvious to one skilled in the art.

Finally, plaintiff touts the safety feature of the invention that ensures that unwanted objects—those without RFID tags—are not inadvertently heated if placed in proximity to the heater. As defendants point out, however, the detection of an object with a tag is an elemental use of RFID, as is the "exclusionary" feature of allowing for a particular response only if a particular type of object is detected. Such a basic property of RFID is well-known in the prior art (including, for example, the White Paper).

Plaintiff has not explained how these benefits were absent from the prior art,

except to argue that the specific combination of elements found in its patents' claims had not been disclosed.  Plaintiff sums up its argument concerning obviousness as follows: "None of the prior art patents cited by defendants use or even remotely suggest using RFID information to control the heating operation of a forcibly-centered, RFID-tagged object on an induction heater while simultaneously preventing unwanted objects from being heated."  Of course, as explained at length by the Supreme Court in *KSR*, obviousness does not require that any particular prior art reference have used or suggested the exact combination used by plaintiff in these patents.  As discussed above, the various prior art references contain varying combinations of some of those elements, and in light of those references, it would have been obvious to one skilled in the art to arrive at this specific combination to achieve the benefits claimed by plaintiff.

As noted above, there is no dispute of material fact concerning the standard of one skilled in the art in this case, and there are no secondary considerations present here. Nor is there any dispute of material fact concerning the scope of the patent claims at issue, the disclosures present in the prior art references, or the differences between the two.  As in *KSR*, the prior art references show plaintiff's patent claims to have been obvious.  As in *KSR*, the fact that key references were not presented to the PTO in the prosecution of these patents makes the applicable clear-and-convincing evidence standard easier to satisfy.  As in *KSR*, the lack of expert testimony is not material, as the obviousness of the patent claims is clear without the need for such testimony.

40

Accordingly, the Court concludes as a matter of law, based on clear and convincing evidence, that the claims at issue in the '585 Patent and the '169 Patent are obvious and therefore invalid pursuant to 35 U.S.C. § 103, and the Court awards defendants summary judgment on their claims for declaratory judgments of invalidity with respect to Claims 1-7, 24, and 25 of the '585 Patent, and Claims 1-4, 10-12, 15-33, 36-39, 48, 49, 55, and 56 of the '169 Patent.

8.      '513 PATENT

The Court also concludes that the claims of the '513 Patent are obvious. Plaintiff does not dispute that the '585 Patent and the '169 Patent constitute prior art for purposes of the '513 Patent. The former two patents clearly disclose the combination of RFID and induction heating (with other benefits alleged by plaintiff, as discussed above). The '513 Patent also includes the use of a heating instructions, found on a recipe card or on a food package, kept separate from the cooking vessel. Defendants have cited to prior art references, however, that disclosed such a use of separate heating instructions in coded form. Plaintiff's only argument is that those references do not include the novel feature that the same reader reads both the instruction card and the tag on the heated object. Plaintiff has not attempted to explain why using one reader instead of two would not be logically and predictably tried by one skilled in the art, and the Court finds that feature to be obvious as a matter of law. Thus, the Court finds that the claims of the '513 Patent are obvious as a matter of law by clear and convincing evidence, and defendants are

41

granted summary judgment on their claim for a declaratory judgment of invalidity of those claims.

### III.    Plaintiff's Claim for Infringement of the '169 Patent

Plaintiff has asserted a claim against defendants for infringement of Claims 19, 22, 26, and 36 of the '169 Patent.  Defendants seek summary judgment on plaintiff's claim of infringement on various grounds.  The Court has now concluded that those claims of the '169 Patent are invalid.  Accordingly, defendants are entitled to summary judgment on plaintiff's claim of infringement.

Even if those claims of the '169 Patent were valid, defendants would be entitled to summary judgment on other grounds.  Defendants have sought summary judgment on the basis that plaintiff cannot support its claim for monetary relief.  In the Amended Pretrial Order, plaintiff preserved a claim for actual and punitive damages on its contract and tort claims (on which defendants have already been granted summary judgment); the only claim for  "damages" asserted by plaintiff in the Amended Pretrial Order with respect to its patent claims, however, is for its attorney fees and costs pursuant to 35 U.S.C. § 285.

Section 285 permits an award of reasonable attorney fees to the prevailing party in "exceptional cases."  *See id.*  Defendants have moved for summary judgment on plaintiff's claim under Section 285, arguing that plaintiff cannot supply clear and

convincing evidence of bad faith or any other conduct by defendants supporting a finding that this case is exceptional for purposes of Section 285. *See, e.g.*, *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1328-29 (Fed. Cir. 2003) (prevailing party must prove case is "exceptional" by clear and convincing evidence; "exceptional" cases involve inequitable conduct before the PTO, litigation misconduct, bad faith litigation, a frivolous suit, or willful infringement).

Plaintiff has not responded to this motion for summary judgment on its claim under Section 285, and thus plaintiff has failed to provide clear and convincing evidence that this case is sufficiently "exceptional" to warrant an award of fees under that section. Accordingly, defendants' motion is granted as unopposed, and defendants are awarded summary judgment on this claim for fees.

Plaintiff therefore can have no claim for monetary relief based on infringement. The Amended Pretrial Order also includes, within its section setting out non-monetary relief requested by the parties, a claim by plaintiff for a declaration of infringement by defendants. Plaintiff has not opposed summary judgment by reference to that declaratory judgment claim, however, and thus plaintiff is deemed to have abandoned that claim. Moreover, even if the claim were not abandoned, the Court in its discretion would decline to exercise jurisdiction over that declaratory judgment claim, in the absence of any claim for damages or fees. The Court notes in that regard that plaintiff has claimed only past infringement in this case, and does not claim any ongoing infringement by

43

defendants.  *See* Memorandum and Order of Apr. 13, 2010 (Doc. # 217) at 2-3 & n.2 (accepting plaintiff's limitation of its claim to past infringement only).  Accordingly, on this alternative basis, defendants are awarded summary judgment on plaintiff's claim for infringement of the '169 Patent in its entirety.[9]

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiff's motion for summary judgment (Doc. # 349) is **denied**, and plaintiff's claims for declaratory judgments relating to the '675 Patent are hereby dismissed for lack of subject matter jurisdiction.

IT IS FURTHER ORDERED BY THE COURT THAT defendants' motion for summary judgment (Doc. # 342) is **granted in part and denied in part**.  The motion is granted with respect to plaintiff's claim for infringement of the '169 Patent, and with respect to defendants' claims seeking declarations that certain claims of the '585 Patent, the '169 Patent, and the '513 Patent are invalid as obvious; defendants are awarded summary judgment on those claims.  The motion is denied with respect to defendants' claim that plaintiff's patents are unenforceable because of inequitable conduct.

---

[9]In light of these rulings, the Court does not address the parties' arguments concerning whether a question of fact exists concerning infringement and whether plaintiff's claim is precluded by certain covenants-not-to-sue.

IT IS SO ORDERED.


Dated this 9th day of March, 2012, in Kansas City, Kansas.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge