IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IMURA INTERNATIONAL U.S.A., INC.,       )
and VITA CRAFT CORPORATION,             )
                                         )
            Plaintiffs,                  )
                                         )
      v.                                 )            Case No. 08-2220-JWL
                                         )
HR TECHNOLOGY, INC.,                     )
f/k/a THERMAL SOLUTIONS, INC.,           )
                                         )
            Defendant.                   )
                                         )
_____)

## MEMORANDUM AND ORDER

In this case, the parties asserted various patent claims and state-law contract and

tort claims against each other arising out of contracts between them.  By the time of trial,

all of the claims other than an inequitable conduct claim had been resolved, either by

Court ruling or by having been abandoned.[1]

On April 16 and 17, 2012, the Court conducted a bench trial of that remaining

claim, by which plaintiffs Imura International U.S.A., Inc. and Vita Craft Corporation

(collectively "Vita Craft") sought a declaration of unenforceability of three patents held

by defendant HR Technology, Inc. ("HRT"), based on inequitable conduct before the

United States Patent and Trademark Office ("PTO").  At the conclusion of Vita Craft's

presentation of evidence, the Court granted HRT's motion for judgment on the claim

---

[1]Plaintiffs' claim for attorney fees pursuant to 35 U.S.C. § 285 also remains.

pursuant to Fed. R. Civ. P. 52(c)[2] and stated that findings of fact and conclusions of law would follow by written memorandum and order.  The Court now makes the following findings of fact and conclusions of law in support of the judgment, pursuant to Fed. R. Civ. P. 52(a).

### I.    Governing Law

Inequitable conduct regarding any claim in a patent renders the entire patent unenforceable.  *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288 (Fed. Cir. 2011) (en banc).  Last year, in *Therasense*, the Federal Circuit "tighten[ed] the standards for finding both intent and materiality" as required for a finding of inequitable conduct.  *See id.* at 1290.  The Federal Circuit described the intent requirement as follows:

> To prevail on a claim of inequitable conduct, the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO.  A finding that the misrepresentation or omission amounts to gross negligence or negligence under a "should have known" standard does not satisfy this intent requirement.  In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a *known* material reference.  In other words, the accused infringer must prove by clear and convincing

---

[2]In a bench trial, a motion for judgment at the close of the plaintiffs' evidence is governed by Fed. R. Civ. P. 52(c).  *See Nieto v. Kapoor*, 268 F.3d 1208, 1217 (10th Cir. 2001).  Rule 52(c) provides in pertinent part:  "If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  *See* Fed. R. Civ. 52(c).

evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it.

. . .

Intent and materiality are separate requirements. A district court should not use a "sliding scale," where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa. Moreover, a district court may not infer intent solely from materiality. Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality. Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive.

Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence. However, to meet the clear and convincing standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence. Indeed, the evidence must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances. Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found.  . . .

Because the party alleging inequitable conduct bears the burden of proof, the patentee need not offer any good faith explanation unless the accused infringer first proves a threshold level of intent to deceive by clear and convincing evidence. The absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive.

*Id.* at 1290-91 (internal quotations and citations omitted). The court further described

the materiality requirement as follows:

This court holds that, as a general matter, the materiality required to establish inequitable conduct is but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art. Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference.  In making this

patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction. Often the patentability of a claim will be congruent with the validity determination—if a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in a district court requires clear and convincing evidence, a higher evidentiary burden than that used in prosecution at the PTO. However, even if a district court does not invalidate a claim based on a deliberately withheld reference, the reference may be material if it would have blocked patent issuance under the PTO's different evidentiary standards.

*Id.* at 1291-92 (citations omitted).

## II.     Findings of Fact

In this claim, Vita Craft sought a declaration that the three patents held by HRT—U.S. Patent No. 6,232,585 ("the '585 Patent"), U.S. Patent No. 6,320,169 ("the '169 Patent"), and U.S. Patent No. RE 42,513 ("the '513 Patent") (a reissue of U.S. Patent No. 6,953,919)—are unenforceable because of inequitable conduct before the PTO. Specifically, Vita Craft argued that the inventor, Brian Clothier, who is HRT's principal, should have disclosed to the PTO as prior art a Motorola White Paper on which Mr. Clothier seemingly relied in drafting the patents.

By its Memorandum and Order of March 9, 2012 (Doc. # 382), the Court denied Vita Craft's motion for summary judgment on this claim. The Court concluded that, under the Federal Circuit's newly-heightened standard for inequitable conduct, a question of fact remained concerning whether Mr. Clothier had the specific intent to deceive the PTO. The Court relied on Mr. Clothier's testimony that his patent attorney

removed the citation to the White Paper because that reference was cumulative or merely

provided background information, in the sense that its information was already described

in the known prior art concerning RFID and that it did not include any mention of the

application of RFID to induction heating.  The Court concluded that such testimony

supported a reasonable inference that Mr. Clothier did not remove the citation to the

White Paper with the specific intent to deceive the PTO, which meant that Vita Craft had

failed to carry its burden to show intent by clear and convincing evidence as a matter of

law.  In light of that ruling, the Court did not address the question of the White Paper's

materiality.

In the same Order, the Court granted Vita Craft summary judgment on another

declaratory judgment claim and ruled that the three patents were invalid as obvious under

35 U.S.C. § 103.  Vita Craft argued that the patents' combination of radio frequency

identification (RFID) technology and induction heating was obvious under the standards

set forth by the Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398

(2007).  The Court considered five prior art references cited by Vita Craft, consisting of

the White Paper and four patents.  The Court concluded that the four patents disclosed

the following: Harnden disclosed the use of a radio frequency transmitter to send

temperature information to an induction heater; Wauer disclosed the use of SAW

wireless RF technology, a type of RFID technology, to transmit temperature and object-

identifying information from a pot to a stove, and Wauer cited to other patents involving

induction heating; Harris disclosed the use of wireless RF to communicate temperature

5

and object-identifying information to control cooking, including cooking with an induction heater; and Smrke disclosed the use of wireless RF to communicate temperature data to control cooking. The Wauer and Harris patents were not considered by the PTO in the prosecution of the patents. The Court rejected Vita Craft's argument that the White Paper's list of over 30 possible applications for RFID technology made the combination of RFID and induction heating any more obvious. Nevertheless, the Court concluded that, under *KSR*, clear and convincing evidence established that the combination of RFID and induction heating was obvious as a matter of law. The Court noted that the prior patents as a whole had disclosed the use of RF technology, including a type of RFID, to use data to control cooking, including cooking by induction heating. The Court further concluded that the benefits of using RFID made that technology an obvious alternative to other forms of RF communication that one skilled in the art would try, with predictable results. Finally, in response to HRT's arguments about certain benefits of the inventions at issue, the Court concluded that locating the cookware over the heater would have been obvious to one in the art, and that the "exclusionary" feature of allowing for a particular response only for a particular type of object was a basic property of RFID that is well-known in the prior art.

The White Paper discusses how RFID works. The White Paper does not include any reference to the combination of RFID and induction heating, but it does list over 30 other possible uses for RFID. Those possible uses include examples of the use of RFID for exclusion (allowing for a response only upon detection of an RFID tag), location, and

6

control of a host system.

Mr. Clothier conceded in his testimony that he learned about RFID technology from the White Paper, from other materials obtained from RFID manufacturers, and from other sources on the internet.  Mr. Clothier testified that he could not recall specifically whether, in drafting the patents' specifications, he copied from the White Paper or simply used his knowledge obtained from other sources.  The Court finds, however, that Mr. Clothier did rely directly on the White Paper in drafting the patents' specifications, based on the similarity of some passages and the fact that the preferred embodiments cited in the patents used specific Motorola products discussed in the White Paper. Although Mr. Clothier's drafts of the patents included a citation to the White Paper, the citation was omitted in the final applications to the PTO.  Nor did Mr. Clothier include the White Paper in his disclosures to the PTO of relevant prior art.

The PTO examiner originally rejected certain claims involving RFID in the application for the '585 Patent, based essentially on the following reasoning: prior art disclosed the claimed invention except for the addition of RFID to the tracking of delivery containers; that the prior Howell and Palmer patents showed that it was well-known in the art to apply RFID to store and control the flow of food items; and that it therefore would have been obvious to one skilled in the art to use RFID to locate and to monitor food.  Mr. Clothier then met with the examiner and filed an amendment of the rejected claims, in which he argued essentially that his claims were not obvious because no prior art described the use of RFID to control induction heating.  The examiner

7

subsequently allowed the claims, although there is no other evidence of the examiner's reasoning. Similarly, the same examiner originally rejected the RFID claims in the '169 Patent based on the reasoning that it would have been obvious to one skilled in the art, because of Howell and Palmer, to use RFID to monitor and control induction heating of food products. Again, in his subsequent amendment, Mr. Clothier argued that the "combination" claims were not obvious because none of the prior art described or suggested the use of RFID with an induction heater, and the examiner then allowed the claims without a specific discussion of the RFID-induction heating combination.

In considering the '169 Patent application, the examiner also considered the Brady patent, which relates to RFID tags. Brady discloses various uses for RFID technology, including with respect to the identification of railway cars, automatic tolls, employee identification badges, security badges, animal identification, and the tracking of components in the manufacturing process.

When questioned on direct examination by Vita Craft's counsel, Mr. Clothier testified that his patent counsel, John Collins, would have been responsible for the final versions of the patent applications, and that he would have relied on Mr. Collins for the ultimate deletion of the citation to the White Paper from the applications. Vita Craft presented evidence suggesting that Mr. Clothier did not send Mr. Collins his copy of the White Paper until after the '585 Patent application had already been filed. Mr. Clothier then conceded that either he or Mr. Collins may have been responsible for the ultimate deletion of the reference from the application. Either way, Mr. Clothier testified, based

8

on his recollection and understanding, that the citation was not included because the White Paper provided only background information about RFID technology and thus was cumulative of general knowledge by those in the art about RFID; that he was not claiming any novel feature of RFID in his inventions; and that he therefore did not believe specific citation to the White Paper was necessary.  Vita Craft did not offer any testimony or any other evidence concerning Mr. Collins's rationale or intent.

At trial, HRT challenged whether a case or controversy existed with respect to these three patents, and thus whether the Court had subject matter jurisdiction over Vita Craft's claim of inequitable conduct.  The Court previously rejected that argument on two occasions, in both its Memorandum and Order of April 13, 2010 (Doc. # 217), and its Memorandum and Order of June 3, 2011 (Doc. # 319).  At trial, HRT argued that circumstances had changed since those orders because Vita Craft had recently abandoned its contract claims, by which it had challenged HRT's termination of the license agreements between the parties.  HRT argued that those contracts prohibit Vita Craft's post-termination use of confidential information, and that Vita Craft therefore cannot undertake any potentially-infringing activity.  The Court, however, accepted Vita Craft's stipulation that the abandonment of its contract claims and the potential for a claim of breach by HRT did not alter its previously-expressed intent to engage in activity that could arguably infringe these patents.  The Court thus finds that Vita Craft does continue to have such intent, and that circumstances therefore have not changed in a material way since its prior orders regarding the existence of subject matter jurisdiction.

9

III.   **Conclusions of Law**

A.   *Subject Matter Jurisdiction*

The Court concluded at trial that it still had subject matter jurisdiction over Vita Craft's inequitable conduct claim, under the standards expressed in its prior rulings on that issue.  The Court rejected HRT's argument that Vita Craft's abandonment of its contract claims robbed the Court of jurisdiction over this claim.  As found above, Vita Craft's future intent regarding these products did not change in light of that abandonment; accordingly, there was no basis to alter the Court's previous conclusion that there was a case or controversy here that provided subject matter jurisdiction.

B.   *Materiality*

With respect to the merits of Vita Craft's claim, the Court concluded at trial that Vita Craft failed to satisfy its burden to show the White Paper's materiality.  The Court elaborates on that conclusion as follows.  The Court rejects Vita Craft's argument that the White Paper is necessarily material in this context because the Court mentioned the White Paper when it declared these three patent invalid as obvious.  In fact, the White Paper was not essential or even particularly important to the Court's reasoning.  To the contrary, the Court concluded, under the Supreme Court's "combination" analysis in *KSR*, that the combination of induction heating and RFID was obvious in light of certain patents that together involved the use of RF communication (including one type RFID) to control the heating of food, including by induction heating.  Indeed, in its summary judgment arguments concerning obviousness, Vita Craft insisted that the patent merely

claimed a combination of induction heating and off-the-shelf RFID technology; that there was nothing novel about the patents' use of RFID; that it was well-known that RFID could be implemented into nearly any host system; and that it would be obvious to one skilled in the art (as supported by Vita Craft's expert) to try different combinations of heaters and types of RF communication. The Court essentially agreed with this argument by Vita Craft. Thus, the Court did not need to rely on the White Paper's examples of various uses (but not including induction heating) for RFID.

Vita Craft also failed to establish the necessary but-for materiality, as the Court is not persuaded that the PTO would have rejected the claims as obvious if the White Paper had been disclosed by name. Vita Craft's argument on this element is undone by its insistence at summary judgment that the PTO examiner ultimately allowed the RFID claims because he applied the then-prevailing TSM test for obviousness. After considering the evidence presented by Vita Craft at trial, the Court agrees that, in allowing the patent claims, the examiner most likely accepted Mr. Clothier's argument that the claims were not obvious because no prior art reference disclosed or suggested the specific combination of induction heating and RFID. In light of that fact, the Court cannot conclude that the examiner would have done otherwise if confronted with the White Paper, which, as the Court has previously stated, does not make the combination of RFID and induction heating any more obvious. Just as Vita Craft suggested at summary judgment, the different outcomes before the PTO and this Court is explained by the standards applied (as the Supreme Court in *KSR* rejected the TSM test and relaxed

11

the standard for finding a combination to be obvious); it did not result from the additional citation of the White Paper to this Court.

At trial, Vita Craft attempted to stress the White Paper's listing of certain uses that could implicate RFID's capacity to exclude, control, and locate—functions also performed through RFID in the patents. That listing does not provide significant evidence that the PTO examiner would have rejected the patents if the White Paper had been cited, however. Again, as Vita Craft demonstrated at summary judgment, all functions of RFID were well-known in the art, and there is no evidence that the examiner was not familiar with the knowledge of one skilled in the relevant art. In fact, in the application process for one patent, the examiner cited to Brady, which includes a list of uses similar to the White Paper's list—including a mention of the use of RFID in tollbooths, the very same exclusionary example from the White Paper that Vita Craft stressed so heavily at trial. It is also significant, as noted by Vita Craft at summary judgment, that the patents did include particular RFID model numbers; thus, it must be assumed that the examiner understood that all RFID functions of those models were already publicly-known. It is certainly clear that the examiner understood that Mr. Clothier was not claiming any novel function of RFID; thus, there is no reason to believe that the disclosure of a particular reference that set out or alluded to RFID functions would have changed the outcome before the examiner.

Finally, at trial Vita Craft argued that the White Paper was a unique prior art reference because Mr. Clothier relied so heavily on it in learning about RFID and in

drafting the patents.  Without the necessary but-for materiality, however, the White Paper's importance to Mr. Clothier is irrelevant.

For these reasons, the Court concluded at trial that Vita Craft failed to satisfy its burden to show, by a preponderance of the evidence, that Mr. Clothier's failure to disclose the White Paper to the PTO was material, and the Court therefore ruled in favor of HRT on Vita Craft's inequitable conduct claim.

### C.    Intent

The Court also concluded at trial that Vita Craft failed to meet its burden to show, by clear-and-convincing evidence, that Mr. Clothier had the specific intent to deceive the PTO in omitting the reference to the White Paper.  *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 n.5 (Fed. Cir. 2007) ("clear and convincing" standard lies between the preponderance-of-the-evidence and beyond-a-reasonable-doubt standards; "clear and convincing evidence" is evidence that "places in the ultimate factfinder an abiding conviction that the truth of its factual contentions [is] highly probable") (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).  The Court elaborates on that conclusion here.

As set forth above, Vita Craft was required to show that Mr. Clothier knew that the White Paper was material.  The Court found, however, that Mr. Clothier was credible in testifying that he believed the White Paper merely to provide background information that was cumulative of the knowledge of one skilled in the art.  That testimony is supported by the fact that Mr. Clothier did not attempt to hide any information about

RFID, including particular model numbers used in the preferred embodiments, as well as the fact that Mr. Clothier clearly did not attempt to claim anything novel about RFID technology itself.  Thus, the Court concludes that Vita Craft failed to show, even to a lower preponderance standard, that Mr. Clothier knew that the White Paper was material.

Similarly, the Court found credible Mr. Clothier's sworn testimony that he did not intend to deceive the PTO by omitting the reference to the White Paper.  Vita Craft did not present any evidence concerning the intent of Mr. Collins (which could perhaps be imputed to Mr. Clothier) or the testimony of any other witness in its case-in-chief.[3] Certainly, Vita Craft's evidence did not *require* a finding of deceitful intent by Mr. Clothier, and his credible testimony provided a reasonable alternative inference; thus, under the standards enunciated in *Therasense*, Vita Craft did not show the necessary intent by clear and convincing evidence.  For these reasons, Vita Craft's claim failed on this element as well.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant HRT is awarded judgment on plaintiff Vita Craft's claim of inequitable conduct.

IT IS SO ORDERED.

---

[3]At trial, Vita Craft's counsel represented that HRT delayed in producing the White Paper in response to discovery requests.  In its case-in-chief, however, Vita Craft did not submit any evidence of the circumstances of the disclosure.  Thus, the Court does not consider any such alleged delay.

14

Dated this 24th day of April, 2012, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge