IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

HR TECHNOLOGY, INC.,           )
f/k/a THERMAL SOLUTIONS, INC., )
                               )
            Plaintiff,         )
                               )
      v.                       )      Case No. 08-2220-JWL
                               )
IMURA INTERNATIONAL U.S.A., INC.; )
VITA CRAFT CORPORATION; and    )
MAMORU IMURA, an individual,   )
                               )
            Defendants.        )
_____)

## MEMORANDUM AND ORDER

In this case, the parties asserted various patent claims and state-law contract and tort claims against each other arising out of contracts between them. On April 27, 2012, the Court entered judgment on the parties' claims, pursuant to various pretrial rulings and findings and conclusions issued by the Court after a bench trial. On July 20, 2012, the Court granted in part a motion by plaintiff HR Technology, Inc. ("HRT"), and the Court opened the judgment to allow HRT to assert a claim against defendants Imura International U.S.A., Inc. and Vita Craft Corporation (collectively "defendants")[1] for specific performance of one provision of two contracts between the parties. The parties

---

[1]HRT's trial brief indicates that it asserts this claim for specific performance only against the two corporate defendants, which are affiliated entities. Defendants have not opposed the assertion of this claim against both corporations, and thus the Court continues in this case to consider them together for purposes of these contracts.

tried that claim to the Court on September 11 and 12, 2012.

This Memorandum and Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).  The Court awards judgment in favor of HRT on this claim for specific performance, and HRT is entitled to relief to the extent and for the reasons set forth below.  Defendants shall return all "Confidential Information," as that term is defined in Section 19 of the relevant license agreements between the parties, and as interpreted by the Court herein, without retention of any copies, on or before **October 26, 2012**.  As part of that judgment, defendants are not required to assign their rights in any patents or patent applications to HRT.

## I.   <u>Findings of Fact</u>

On April 2, 2003, HRT and defendants executed a license agreement, which the parties call the Asia License, by which HRT licensed to defendants certain patents and technology relating to cookware.  On November 22, 2004, HRT and defendants executed another license agreement, referred to as the Worldwide License, relating to the same patents and technology but including additional geographic territories.  By this claim, HRT seeks specific performance of one provision of Section 19 of the two license agreements (collectively "the Licenses"), which was the same in both Licenses and which provided as follows:

> 19.   <u>Confidential Information:</u>  **All information relating to the RFID Technology and the Patents that is or has been disclosed to Licensee by Licensor or Licensor's behalf as well as information that**

> **Licensee or an Authorized Manufacturer develop** [sic] **as a result of this License or a manufacturing agreement will be "Confidential Information," subject to the limitations of this License.** Unless Licensor gives specific written permission to do otherwise, Licensee will maintain all Confidential Information in strict confidence and will not disclose Confidential Information to any third party by any means. Furthermore, Licensee will not use Confidential Information for any purpose other than to carry out the License. These obligations will continue indefinitely and specifically survive the termination of this License.
>
> Licensee will disclose Confidential Information only to those of its employees or to an Authorized Manufacturer that has a need to know in order to carry out the License and any manufacturing authorized under such license. **Upon termination of this License for any reason, all Confidential Information in any form shall be returned to Licensor[.]**
>
> Licensee shall insure that each Authorized Manufacturer is bound by contractual confidentiality provisions that are at least as restrictive as this Section and that give either directly to Licensor or to Licensee sufficient rights to enforce the confidentiality provisions to ensure that there is no unauthorized use of Confidential Information.

(Bold added.) Specifically, HRT seeks specific performance of the provision, bolded above, that requires defendants to return "Confidential Information" ("CI") to HRT upon termination of the Licenses. CI is defined in Section 19, as set forth in bold above. Pursuant to the Court's ruling in opening the judgment, the provisions of Section 19 prohibiting defendants' use or disclosure of CI are not at issue.

After the execution of the Asia License but before the execution of the Worldwide License, the parties disputed whether HRT was required, pursuant to Section 6 of the Licenses, to provide certain software and computer code to defendants. Section 6 provided in relevant part as follows:

3

> Licensor shall furnish to Licensee all necessary information pertaining to the granted Patents and the patent applications and related RFID technology as is reasonably necessary to enable Licensee to enjoy the benefits of this License. All such information shall be treated as confidential information subject to the terms of Section 19 below.

In an e-mail dated May 14, 2004, HRT's counsel stated to defendants' counsel that Section 6 "requires the furnishing of 'information' and does not require Licensor to perform software programming or to deliver any software that may be requested or desired by Licensee." In an e-mail dated November 12, 2004, HRT's counsel stated to defendants' counsel that it did not make sense to execute the Worldwide License if the parties had different understandings of the licenses' requirements regarding software and other issues.

On November 22, 2004, contemporaneous with the execution of the Worldwide License (which contained Sections 6 and 19 identical to those in the Asia License), the parties executed a Software License. The Software License referred to the Asia License and the Worldwide License, and it noted that HRT had created and delivered to defendants, or might create and deliver to defendants, certain software useful to defendants in utilizing the licensed patents and technology. The Software License did not require HRT to provide any software or computer code to defendants; rather, by the Software License, HRT granted to defendants an "exclusive, royalty-free, perpetual license" to use any such software provided by HRT for the development or sale of products "authorized to be produced under the [two Licenses] in accordance with [their] terms and conditions."

HRT did provide information to defendants, including software and computer programming code, for defendants' use under the Licenses. HRT terminated the Licenses on February 9, 2006. Although defendants provided to HRT in discovery copies of documents that would qualify as CI, defendants have not returned to HRT all existing copies or forms of information in their possession relating to the Licenses that were provided by HRT or were developed by defendants.

The Court finds that the fact and amount of monetary damages for any breach by defendants of the return-of-CI provision of Section 19 of the Licenses would be difficult to ascertain, and that such damages would not afford HRT complete relief for such breaches.

## II.     Conclusions of Law

### A.     *Governing Standard*

HRT seeks an order of specific performance of Section 19's return-of-CI provision under this standard set forth by the Kansas Supreme Court[2] in *Hochard v. Deiter*, 219 Kan. 738 (1976):

> Whether equity will decree the specific performance of a contract rests in the sound judicial discretion of the court and it always depends upon the facts and circumstances of the particular case. . . .

---

[2]The parties and the Court have applied Kansas contractual law throughout this case. The License Agreements and the Software License contain Kansas choice-of-law provisions.

The remedy of specific performance is governed by the same general rules which control the administration of other equitable remedies. In particular, therefore, when the party seeking specific performance of a contract establishes the existence of a valid binding contract, which is definite and certain in its terms and contains the requisite of mutuality of obligation, and is one which is free from unfairness, fraud, or overreaching, and enforceable without injustice upon the party against whom enforcement is sought, the court will, when the remedy at law for the breach of such contract is inadequate and the enforcement of specific performance will not be inequitable, oppressive, or unconscionable, or result in undue hardship, grant a decree of specific performance as a matter of course or right.

*Id.* at 740 (quoting 71 Am. Jur. 2d, *Specific Performance* § 7 at 19).

### B.   *Scope of the Provision – Requirement of Confidentiality*

The Court first addresses the parties' arguments concerning the proper scope of the provision requiring defendants to return all CI to HRT.  Defendants assert that CI should be interpreted to include only information that is confidential, that is, information that is not in the public domain.  Defendants argue that the word "Confidential" in Section 19 would otherwise be superfluous and that it would be absurd for the parties to have intended that already-public information could not be retained by defendants.

"A cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if the intention is consistent with legal principles." *Hollenbeck v. Household Bank*, 250 Kan. 747, 751 (1992) (quoting *Garvey Ctr., Inc. v. Food Specialties, Inc.*, 214 Kan 224, 229 (1974)).  "When a contract is plain and unambiguous, the parties' intent should be determined from the instrument." *Id.*  A contract's own definition of a term in that contract controls.  *See Penncro Assocs., Inc.*

6

*v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1152 (10th Cir. 2007) (in case involving Kansas law, noting that "parties to a contract may define their terms as they please—a duck may be a goose").

The Court rejects this attempt by defendants to modify the parties' own definition of CI in the Licenses.  Section 19 requires the return of "Confidential Information," which was expressly defined within the same section of the Licenses.  That definition unambiguously requires the return of all "information" relating to the licensed technology and patents disclosed to defendants by HRT or developed by defendants as a result of the Licenses.  There is no requirement that such information be confidential in the normal sense of that word.  Defendants note the many occurrences of the word "Confidential" throughout Section 19, but the word was used only as part of the specially-defined term "Confidential Information."  Thus, the use of the word "Confidential" was not superfluous because it was used to identify *which* information must be returned, namely the information included within Section 19's definition of "Confidential Information."  The word "Confidential" was reasonably chosen as that identifying adjective because that information could not be disclosed—and thus had to be kept confidential, in the normal sense—by defendants.

Moreover, requiring defendants to return even public information does not lead to an absurd result.  Even if information might enter the public domain, the parties could quite reasonably have intended to avoid any dispute concerning whether a piece of information was truly public by simply requiring the return of all information that

defendants acquired by reason of the Licenses.  The parties could also reasonably have intended to avoid allowing defendants to retain previously-confidential information simply by disclosing such information to the public themselves.  Section 19's definition of CI is not ambiguous in this regard, and the Court therefore interprets that definition according to its plain terms, which do not require confidentiality for inclusion within the scope of the definition.

Defendants also assert that, to the extent that Section 19 requires the return of information that is in the public domain, it should be invalidated under Kansas law as an illegal restraint of trade.  The Court rejects this argument as well.  Defendants have cited only cases involving non-compete or nondisclosure provisions in employment contracts. Defendants also rely on a statement from a note to a comment in the Restatement of Unfair Competition that "[a] promise to refrain from the use or disclosure of commercial information is ordinarily unenforceable unless the information is sufficiently secret to justify the restraint."  *See* Restatement (Third) of Unfair Competition § 41 cmt. d, reporter's note.  That section relates specifically to the tort of the misappropriation of trade secrets, however, and the cases cited in support of the statement generally involve employment contracts or are otherwise inapposite.  Defendants have not cited any authority suggesting that a contract relating to the return, use, or disclosure of licensed intellectual property should be invalidated as an illegal restraint on competition or trade.

The Court quite recently engaged in a thorough analysis of this very issue under Kansas law.  *See Layne Christensen Co. v. Bro-Tech Corp.*, 836 F. Supp. 2d 1203, 1223-

26 (D. Kan. 2011) (Lungstrum, J.).  In *Layne*, the Court rejected the defendant's attempt, pursuant to K.S.A. § 50-112 (which prohibits unreasonable restraints on competition), to invalidate a provision in the parties' license agreement prohibiting the use of intellectual property resulting from the license to compete with the plaintiff.  *See id.*  The Court concluded that the defendant had not met its burden to show that the restraint was unreasonable and therefore unenforceable, as follows:

> Based on these cases from the Kansas Supreme Court, the Court concludes as a matter of law that Purolite has not met its burden to show that the provision in Section 11.2 of the Agreement is unreasonable in violation of K.S.A. § 50-112.  Under Kansas law, the Agreement is presumed to be valid.  As a part of the Agreement, Layne granted a license and disclosed its intellectual property to Purolite, and it was reasonable for the parties to agree to restrict Purolite's use of that intellectual property and any other intellectual property that resulted from activities under the Agreement to compete with Layne's own products.  Purolite was not prohibited from competing with Layne altogether—it only had to forego competition using the intellectual property gained as a result of a contract that included benefits for Purolite and that Purolite willingly entered into.  Nor did the Agreement stifle competition in the market generally, as Purolite has not shown that a monopoly existed here.  Nor did the Agreement involve a public service corporation or the like.  The fact that the restriction did not include temporal or geographic limitations is not especially pertinent, as the Kansas Supreme Court has made clear.  This case does not involve a monopoly or price-fixing, as in the cases consistently distinguished by the supreme court.  Moreover, if the right to compete could not be contracted away in this manner, companies would be discouraged from licensing their technology to other companies.  Finally, Purolite has not cited any Kansas authority suggesting that Section 11.2 should be invalidated as a violation of K.S.A. § 50-112.

*Id.* at 1226.

Essentially for the same reasons, the Court in *Layne* also rejected the defendant's similar attempt to invalidate the contractual provision as unreasonable under Delaware

9

law.  *See id.* at 1231-34.  The defendant in *Layne*, like defendants here, relied on cases involving employment contracts; the Court, however, cited cases, including cases from the Tenth Circuit, indicating that the interest in protecting intellectual property is more worthy of protection than in the case of the typical non-compete.  *See id.* at 1232-33 (citing, *inter alia*, *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1134 (10th Cir. 2003)); *see also Harvey Barnett*, 338 F.3d at 1134 (reasoning that confidentiality and nondisclosure agreements should not be treated like restrictive covenants because they serve different purposes).

Defendants do not rely on K.S.A. § 50-112 and its reasonableness test in this case. Even the employment cases cited by defendants recognize, however, that agreements that restrain a party's ability to compete may be justified by legitimate business purposes. *See Wichita Clinic, P.A. v. Louis*, 39 Kan. App. 2d 848, 855 (2008); *Allen, Gibbs & Houlik, L.C. v. Ristow*, 32 Kan. App. 2d 1051, 1054 (2004).  For the same reasons set forth in *Layne*, the Court concludes that HRT had a legitimate and reasonable interest in protecting its intellectual property by requiring the return of information given to or developed by defendants as a result of the Licenses—an interest distinct from a disfavored restraint of competition in the marketplace generally.  As was the case in *Layne,* defendants are not prohibited from competing with HRT altogether; they must only return intellectual property acquired because of HRT's Licenses.

Finally, defendants attempt to distinguish *Layne* as a case involving only confidential information.  Nothing in *Layne*, however, limits its applicability or

reasoning in that way.  In fact, in *Layne* the Court followed the reasoning of the Seventh Circuit, which had noted that intellectual property, even if not a trade secret, is worthy of protection from invalidation under antitrust law.  *See Layne*, 836 F. Supp. 2d at 1232-33 (quoting *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 585-86 (7th Cir. 2002)).  The Court concludes that the provision at issue here is reasonable, even to the extent that it applies to public information, and that defendants therefore have not satisfied their burden to show that it should be invalidated as an illegal restraint of trade under Kansas law.

> C.      *Scope of the Provision – Software, Code, and Algorithms*

Defendants also argue that Section 19 does not requires the return of software, code, and algorithms provided by HRT after the execution of the Software License.[3] Defendants argue that such information was provided not under the Asia License or the Worldwide License, but under the Software License, which has no return requirement and which has not been terminated.  Defendants further argue that the Software License, which was executed contemporaneously with the Worldwide License, was intended to address HRT's understanding, as evidenced by the e-mail from HRT's attorney, that the requested software was not "information" for purposes of Section 19.

The Court rejects this attempt by defendants to limit the scope of Section 19 in

---

[3]Defendants state in a footnote in their trial brief that they will return software provided before the execution of the Software License, and thus they challenge only the applicability of Section 19 to software provided after execution of that agreement.

this way.  The Court starts with the definition of CI (that which must be returned), which includes all "information" relating to the licensed patents and technology that HRT has disclosed to defendants.  The software and code and algorithms provided by HRT certainly constitute information as that word is ordinarily understood.  *See, e.g.*, *Webster's Third New International Dictionary* at 1160 (1993) (defining "information" as "knowledge communicated by others or obtained from investigation, study, or instruction").  There is nothing within the Licenses that suggests any other intent by the parties with respect to the return-of-CI provision's application to software or computer code.

The fact that certain information within the scope of that provision was disclosed to defendants after—or even because of—the execution of a separate agreement does not take such information beyond the scope of Section 19's definition of CI.  By that definition CI includes "information relating to the RFID Technology and the Patents that is or has been disclosed [by HRT to defendants] as well as information that [defendants] develop as a result of this License."  Under a straightforward reading of this definition, information *developed by defendants* must have been developed as a result of the Licenses to be included within CI, but information *disclosed by HRT* need not have been disclosed under the Licenses—such information need only have been related to the licensed technology and patents to be included within the definition.  Thus, even if software was provided "under" some other agreement, such information relates to the licensed technology, and it therefore qualifies as CI under Section 19.

Moreover, the Software License did not invalidate Section 19 as it related to software. The Software License does not contain any language nullifying any provision of the other two Licenses; to the contrary, the Software License acknowledged the existence and viability of those other contracts, including by its licensing the use of software in conjunction with products to be produced under the Licenses in accordance with their terms and conditions.

Defendants point to the Software License's integration clause, which provided that that agreement constituted the parties' complete agreement and superseded all previous agreements "with respect to the matters described herein." The Software License thus superseded the two Licenses not in all respects, but only with respect to defendants' ability to use HRT's software—the subject of the Software License. The Software License did not address in any respect the return of the software after termination of the Licenses. Thus, the Software License did not abrogate general provisions contained in the Licenses to the extent that they would otherwise apply to HRT's provision of software. *See, e.g., Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 782-84 (10th Cir. 1998) (in case involving Kansas law, interpreting merger clause that superseded prior representations and agreements "relating to the subject matter herein," and overturning district court's interpretation of that merger clause as superseding a prior agreement in its entirety).

Defendants note that the Software License granted them a "perpetual" license that has not been formally terminated, and they argue that a requirement that the software be

returned would be inconsistent with such an ongoing, perpetual license. That "perpetual" license, however, was only for the use of the software in conjunction with products authorized under the Licenses "in accordance with [their] terms and conditions." Thus, by its terms, the software could not be used under the Software License if products were no longer authorized by the Licenses. In effect, then, the Software License terminated when the Licenses terminated. The use of the word "perpetual" still had meaning, in the sense that there was no definite term for the Software License; that license could remain in effect indefinitely as long as products could be developed under the Licenses. This fact that the Software License was effectively coterminous with the Licenses further supports the conclusion that the parties did not intend to override obligations in the Licenses except with respect to matters addressed in the Software License (for instance, the ability to use the software, the lack of any warranty, the lack of a payment obligation).

Defendants insist that the Software License was executed because of HRT's position that it was not required to provide software under Section 6 of the Licenses because software did not constitute "information". It is significant, however, that the Software License did *not* require HRT to provide any software to defendants, but instead merely licensed the use of software that HRT had provided or would provide. Thus, the terms of the Software License do not support defendants' premise regarding the reason for the execution of the Software License. Nor is the e-mail from HRT's attorney helpful in this regard, as it is most reasonably read as stating the position that HRT was

14

not required to develop software for defendants under the Licenses because they require only the provision of already existing "information". The e-mail thus does not indicate any understanding or intent that, once the software had been created for defendants, such software would not fall within the scope of the Licenses' ordinary use of the word "information". Thus, there is no evidence showing any intent by the parties that the Software License would supersede or invalidate general provisions of the Licenses as applied to software provided by HRT.

Finally, the fact that defendants may have paid HRT for at least some of the provided software is irrelevant. The Software Licence did not require payment by defendants; to the contrary, HRT could not charge defendants for the software unless the parties expressly agreed otherwise with respect to specific software. Moreover, the Software License expressly retained ownership of the software in HRT.

For these reasons, the Court concludes that Section 19 of the Licenses requires defendants to return all software, programming code, and algorithms provided to them by HRT that relate to the licensed technology and patents.

        *D.*        <u>*Scope of the Provision – Assignment of Patent Rights*</u>

As part of its claim for specific performance of the return-of-CI provision of Section 19, HRT argues that the Court should order defendants to assign to HRT their rights in four patent applications allegedly based on information subject to the return provision. The Court concludes, however, that such a request does not fall within the scope of the provision sought to be enforced. Thus, the Court need not decide whether

15

those applications were in fact based on information from HRT or whether, as asserted by defendants, the applications were filed with HRT's consent.

In its trial brief, HRT argued that the word "return" relates to the concept of ownership, and that defendants should therefore return its ownership rights relating to information developed under the Licenses that are embodied in the patent applications. Under the definition of CI, however, defendants are only required to return information; they are not required to give up all rights derived or resulting from information relating to the Licenses. In its response brief, HRT argued that the patent applications do constitute "information", while noting that Section 19 requires the return of all CI "in any form." The Court agrees with defendants, however, that patent rights, although personal property, *see* 35 U.S.C. § 261, represent only a legal right; although based on knowledge, patent rights do not constitute knowledge, and thus patent rights do not fall within the ordinary definition of "information", as required for application of the return-of-CI provision.

Finally, at closing argument, HRT conceded that the patent rights represented another form of property into which CI has been converted. HRT argued that assignment of the patent rights would be a way for the underlying CI effectively to be returned. HRT argued that, if defendants had complied with the requirement to return the CI, they would have been unable to file the patent applications. The Court rejects this argument as well. HRT actually complains about defendants' *use* of the CI, but the Court has not permitted HRT to pursue at this stage any claim relating to Section 19's prohibition

16

against defendants' use of CI. *See* Memorandum and Order of July 20, 2012, at 5 (Doc. # 446). If HRT were seeking specific performance of that latter provision, then its request for assignment of the patent rights might be appropriate. The Court concludes, however, that such a remedy does not properly relate to the claim actually at issue—the claim for specific performance of the requirement that defendants return CI to HRT. Defendants' patent rights do not constitute CI; therefore, the Court will not entertain HRT's request for the "return" of those patent rights to it.

The case on which HRT relies, *Cargill, Inc. v. Sears Petroleum & Transport Corp.*, 2004 WL 3507329 (N.D.N.Y. Aug. 27, 2004), is easily distinguished on this basis. In that case, the court, in requiring the assignment of patent rights, was essentially requiring specific performance of a contractual confidentiality provision. *See id.* at *13. The court further noted that the Federal Circuit had "approved the use of the remedy of mandatory assignment of patents in situations where there has been a wrongful appropriation of intellectual property." *See id.* at *14 (citing *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1249-50 (Fed. Cir. 1989)). In this case, HRT's misappropriation claim and its claim for breach of the nondisclosure provision of Section 19 has long since been resolved. In opening the judgment, the Court permitted HRT to pursue only its claim for specific performance of the return-of-CI provision of Section 19. HRT may not continue to litigate a claim under Section 19's other provisions by seeking a remedy, under the guise of a claim under the return-of-CI provision, that relates to an allegation that defendants improperly *used* or *disclosed* CI in applying for patents. Accordingly,

17

the Court rejects this remedy requested by HRT.

E.   *Inadequacy of HRT's Legal Remedy*

In opposing this claim, defendants have not taken issue with HRT's satisfaction of most of the elements required for a claim of specific performance under Kansas law. Defendants do not dispute, and the Court finds and concludes, that the Licenses are valid and binding contracts, definite in their terms, with mutuality of obligation; that the Licenses are free from unfairness, fraud, or overreaching, and that they are enforceable upon defendants without injustice; and that an order of specific performance of the return-of-CI provision would not be inequitable, oppressive, or unconscionable, or result in undue hardship. *See Hochard*, 219 Kan. at 740.[4]

Thus, the only element at issue is whether HRT's remedy at law for defendants' breach of the return-of-CI provision would be inadequate. Defendants argued in their trial briefs that HRT cannot show irreparable harm from such a breach. Kansas law does not require a showing of irreparable harm, however. Long ago, in *Scott v. Southwest Grease & Oil Co.*, 167 Kan. 171 (1949), the Kansas Supreme Court considered the requirement of an inadequate remedy at law in the context of a claim for specific performance as follows:

---

[4]At one time, defendants indicated that they would argue, in opposition to this claim, that HRT's wrongful termination of the Licenses precludes enforcement of the provision requiring the return of CI post-termination. In its trial brief, however, defendants expressly withdrew that defense, on which the Court therefore declines comment.

18

Plaintiff had no adequate remedy at law. Defendant breached the contract. How could any jury estimate with any degree of accuracy the damages plaintiff would suffer in the future by virtue of the breach? How could a jury know how many cans of the product would be sold in the future? Manifestly it could not. Then, too, multiplicity of suits involving constant expense to plaintiff would be required if he were obliged to bring an action at law at the end of every quarter when the payments were due or within the period of limitations. Furthermore, in order to determine the amount due an accounting would be required at the end of each period for which an action was filed.

It is always difficult to formulate a definite rule which will constitute a sufficient guide in all cases for determining whether an adequate remedy at law exists. The mere fact a party can avail himself of some relief at law does not preclude or defeat the jurisdiction of equity to decree specific performance. In order to defeat the jurisdiction of equity to decree specific performance of a contract, it is well established that the remedy afforded at law must be as plain, adequate, complete and efficient as the remedy of specific performance, and not circuitous or doubtful. 49 Am. Jur., *Specific Performance*, § 11. We think the plaintiff quite properly enlisted the aid of equity.

*Id.* at 175-76. Kansas courts have applied these same guidelines for showing the inadequacy of a legal remedy since *Scott*. *See, e.g.*, *Finkenbinder v. Dreese*, 188 Kan. 544, 545 (1961) ("The mere fact that a party can avail himself of some relief at law does not preclude or defeat the jurisdiction of equity to decree specific performance.") (citing *Scott*); *Thurman v. Trim*, 199 Kan. 679, 685 (1967) ("Although the recovery of damages might well provide some relief to the lessee in this case, that remedy lacks the completeness and effectiveness of a decree in equity.") (citing *Scott*); *Miller v. Alexander*, 13 Kan. App. 2d 543, 551 (1989) (quoting *Scott*).

The Kansas Supreme Court has never required a showing of irreparable harm in order to obtain specific performance. As explained in the *American Jurisprudence*

encyclopedia—to which the Kansas Supreme Court cited in both *Scott* and *Hochard*—one way to show an inadequate remedy at law is to show that irreparable damages would otherwise result, but a party might also satisfy this element by showing that damages would be uncertain or difficult to ascertain, or that the property is unique or has some intrinsic or special value. *See* 71 Am. Jur. 2d, *Specific Performance* § 11.[5]

The Court concludes that this standard for an inadequate remedy at law is satisfied in this case. Defendants argue that HRT could simply sue for damages in the form of royalties from any sales by defendants of products developed from CI, as a remedy for any breach by defendants in failing to return CI. As recognized by the Kansas Supreme Court in *Scott*, however, such damages may be difficult to ascertain and cumbersome to obtain. Moreover, a breach by defendants subjects HRT to other potential harms. For instance, Brian Clothier, HRT's principal, testified that licensees of HRT are worried and wonder whether they should proceed in the face of defendants' retention of the CI, and that he doesn't believe that HRT could get other licensees without defendants' return of the CI.[6] In addition, defendants' breach of the return-of-CI

---

[5]In *Hoxeng v. Topeka Broadcomm, Inc.*, 911 F. Supp. 1323 (D. Kan. 1996), the magistrate judge stated in dicta that the plaintiff had failed to show irreparable harm, a requisite to specific performance. *See id.* at 1336. That court did not support that statement with any citation to authority, however. Defendants have not identified any binding or persuasive authority requiring a showing of irreparable harm for an order of specific performance.

[6]Defendants interposed a hearsay objection to this testimony, which the Court overruled. The Court does not consider the truth of whether present and potential
(continued...)

provision could facilitate a future breach of the Licenses' prohibition against defendants' use of the CI—indeed, it is hard to imagine any other reason for defendants' refusal to return the CI. The fact or amount of damages to remedy any such harm could not easily be determined. It is certainly not the case that the remedy afforded at law for HRT would be "as plain, adequate, complete and efficient as the remedy of specific performance, and not circuitous or doubtful." *See Scott*, 167 Kan. at 175. Therefore, the Court concludes that the remedy at law for HRT for a breach by defendants of the return-of-CI provision would be inadequate.[7]

The Court also rejects defendants' argument that because HRT did not identify in discovery any particular harm that it suffered from defendants' breach of the return-of-CI provision, HRT may not now present evidence or argue that its remedy at law is inadequate. In the interrogatory at issue, defendants asked HRT to identify breaches and any "damages" suffered therefrom. As discussed above, however, HRT is not required

_____

[6](...continued)
licensees felt that way; rather, Mr. Clothier's concern in that regard supports the position that it is difficult to determine the extent of any harm suffered by HRT from a breach of the return-of-CI provision.

[7]Defendants argue that HRT would suffer no harm from defendants' failure to return public information because defendants could reassemble such information from those public sources. The determination of whether defendants used public or non-public information for a particular application could very well be difficult, however. Moreover, as noted above, defendants' retention of the CI makes its use in breach of another provision much easier, a harm that is difficult to measure. Accordingly, the Court concludes that HRT's remedy at law would be inadequate even with respect to information that has become public.

to show harm or damages to prevail on its claim for specific performance; to the contrary, HRT must show that money damages would not adequately remedy a breach of this provision.  Defendants did not ask HRT to explain how its remedy at law would be inadequate to remedy a breach of the return-of-CI provision.  Accordingly, HRT did not limit its proof of this claim by its answer to the cited interrogatory.

Defendants also argue that HRT, in answering an interrogatory asking it to identify all CI disclosed to defendants, identified only certain trade secrets.  By its answers, however, HRT clearly took the position that it could not list all of the CI.  Thus, once again HRT did not limit itself with respect to this claim by its interrogatory answers.  Moreover, the time has long since passed for a timely challenge by defendants (such that HRT could cure if necessary) to any interrogatory answers they believed were insufficient.

Accordingly, because HRT has established the required elements, including the inadequacy of its remedy at law, it is entitled to an order of specific performance as a matter of course or right.  *See Hochard*, 219 Kan. at 740.

### F.    Remedy of Specific Performance Here

Finally, the Court addresses defendants' assertion that it provided to HRT in discovery copies of everything they had relating to the licensed technology and patents.  Such an act would not necessarily constitute compliance with the return-of-CI provision of Section 19.  That provision does not permit defendants to retain copies of CI—indeed, by the terms of Section 19, any copies would also constitute CI, which would then need

to be returned to HRT.  This provision was undoubtedly intended not only to allow HRT to have the information back (although this is a minimal benefit, as HRT could be expected to keep copies of anything it provided to defendants), but also to prevent defendants' further use or disclosure of the information in the event of termination of the Licenses.  Accordingly, in complying with this order of specific performance, defendants must return all CI without retaining any copies.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiff HR Technology, Inc. is awarded judgment on its claim for specific performance against defendants Imura International U.S.A., Inc. and Vita Craft Corporation.  Those defendants shall return all "Confidential Information," as that term is defined in Section 19 of the relevant license agreements between the parties, and as interpreted by the Court herein, without retention of any copies, on or before **October 26, 2012**.

IT IS SO ORDERED.

Dated this 28th day of September, 2012, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

23